[No. S141913. Aug. 13, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
GREGORY SEAN ALLEN, Defendant and Appellant.

94

COUNSEL

Michael A. Kresser, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson and Mary Jo Graves, Chief Assistant Attorneys General, Gerald A. Engler, Assistant Attorney General, René A. Chacón, Ralph Sivilla and Linda M. Murphy, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

CHIN, J.—Under the Mentally Disordered Offenders Act (MDO Act or Act) (Pen. Code,[1] § 2960 et seq.), a prisoner adjudicated to be a mentally disordered offender (MDO) may be civilly committed during and after parole if certain conditions are met. (See §§ 2962, 2966.) The People, represented by the district attorney, may file a petition for the MDO's continued involuntary treatment for a period of one year. (§§ 2970, 2972, subds. (a)–(c).) Thereafter, the district attorney may petition to extend that commitment in one-year increments. (§ 2972, subd. (e).) At issue here, section 2972, subdivision (e) (hereafter section 2972(e)), provides that "[p]rior to the termination of a commitment under this section, a petition for recommitment may be filed" to continue the MDO's treatment.

The question here is, does the trial court have authority to extend an MDO's commitment if the petition is filed *after* the prior commitment has terminated? As the parties and the Court of Appeal here have identified the

---

[1] All further statutory references are to the Penal Code unless otherwise noted.

issue, is section 2972(e)'s time requirement mandatory or directory? As we shall explain in greater detail below, we conclude that section 2972(e)'s time limit is mandatory. As such, the district attorney's untimely petition prohibited the trial court from extending Allen's expired commitment from October 14, 2003, to October 14, 2004. Therefore, Allen no longer falls under the jurisdiction of the MDO Act.

However, this does not necessarily mean Allen will be released. As discussed further below, if Allen still suffers from his mental disorder, the Lanterman-Petris-Short Act (LPS Act) (Welf. & Inst. Code, § 5000 et seq.) may apply to provide for the custodial treatment of his disorder.

### Factual and Procedural Background

In 1994, defendant Gregory Sean Allen (Allen) was convicted of felony sexual battery (§ 243.4, subd. (a)), and sentenced to a two-year prison term.[2] In 1997, he was adjudicated to be an MDO and was transferred to the Atascadero State Hospital for treatment during his parole period. Before Allen's scheduled release on October 14, 2000, the Santa Clara County District Attorney successfully petitioned to extend Allen's involuntary treatment to October 14, 2001. Thereafter, two annual proceedings under section 2970 extended Allen's commitment to October 14, 2003.

In April 2003, the medical director of the Napa State Hospital, where Allen was being held, sent a letter to the district attorney recommending that he file a petition to extend Allen's commitment. No petition was filed, however, and Allen's commitment terminated on October 14, 2003. On January 15, 2004, Allen, who was being held at Napa State Hospital, filed a petition for writ of habeas corpus, claiming the trial court lacked jurisdiction to extend his commitment because no recommitment petition was filed before October 14, 2003.

On January 21, 2004, the district attorney filed a petition to extend Allen's commitment for one year to October 14, 2004, which petition Allen moved to dismiss. The district attorney did not explain the reasons for his delay. Allen maintained that even if the court had jurisdiction to consider the petition, the district attorney failed to show good cause for the delay. The district attorney responded that he was not required to make such showing because Allen suffered no "actual prejudice."

---

[2] His conviction was based on his sexual assault of a 51-year-old woman with Down syndrome. While serving his sentence, he assaulted correctional officers and was convicted of battery (§ 4501.5). Based on these subsequent events, he was to be released on October 14, 1997.

The trial court denied both Allen's motion to dismiss and his petition for writ of habeas corpus. On August 3, 2004, it issued an order extending Allen's commitment from October 14, 2003, to October 14, 2004. Allen appealed.

The Court of Appeal majority reversed the trial court's commitment order with directions to dismiss the district attorney's petition. Finding it a "fairly close question," the majority recognized that time requirements are often found to be directory, but concluded "the requirement that a petition to extend a commitment be filed prior to the commitment's termination is a matter of substance rather than one of convenience. It simply makes no sense to seek the *extension* of something that has *ended*."

After distinguishing cases interpreting time limits in the MDO Act and in other civil commitment schemes, the Court of Appeal majority remained "convinced that the Legislature did not contemplate permitting trial courts to entertain extension petitions filed after the termination of an MDO commitment, and therefore the Legislature intended for *this* time limit to be mandatory and for dismissal to be the consequence for its violation." In conclusion, the majority stated that if Allen continues to pose a significant danger to himself or others, the LPS Act (Welf. & Inst. Code, § 5000 et seq., especially §§ 5300–5309 et seq.) remains a viable alternative for his continued commitment should he be released. (See *Zachary v. Superior Court* (1997) 57 Cal.App.4th 1026, 1036, fn. 9 [67 Cal.Rptr.2d 532] (*Zachary*), citing *People v. Hill* (1982) 134 Cal.App.3d 1055, 1060 [185 Cal.Rptr. 64].)

In her concurring and dissenting opinion, Acting Presiding Justice Bamattre-Manoukian disagreed with the majority's conclusion that section 2972(e)'s time limit is mandatory. She determined the provision to be directory based on the statutory language, the purpose of the MDO Act, other time limits in the MDO Act that are directory, and other civil commitment statutes. Because she believed section 2972(e) to be directory, Justice Bamattre-Manoukian would have held that a trial court does not automatically lose its power to hear or decide a petition when a defendant's commitment has terminated. Instead, she reasoned, a court should determine whether a defendant's due process rights were violated by an untimely petition. This "requires a weighing of the justification for the delay in filing the recommitment petition against the prejudice suffered by the defendant as a result of the delay."

Because no due process hearing was held, the dissenting justice would have remanded the matter to determine whether to dismiss the recommitment petition.

DISCUSSION

A. *The MDO Act*

  1. *Background*

"Historically, the states have exercised a power of involuntary civil commitment involving the care and treatment of dangerous mentally disordered individuals. While some of these schemes operate in a manner largely independent of the criminal justice system, others are triggered only after criminal charges have been filed. Some criminal defendants receive a mental health commitment in lieu of conviction and punishment. Other mentally ill defendants are committed upon completion of their prison terms." (*Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1143 [81 Cal.Rptr.2d 492, 969 P.2d 584], fns. omitted.) In this case, we are concerned largely with the last group—those mentally disordered defendants subject to the MDO Act who are civilly committed as a condition of parole. (§ 2960 et seq.)

In 1985, the Legislature enacted the MDO Act to respond to the state's "dilemma caused by the determinate sentencing system." It explained: "To maintain a determinate system will inevitably cause the release of some mentally ill inmates who constitute a significant threat to public safety. This commitment will provide a mechanism for placing these mentally ill inmates in the mental health system for appropriate treatment which will increase the protection of the public." (Dept. of Mental Health, Enrolled Bill Rep. on Sen. Bill No. 1296 (1985–1986 Reg. Sess.) Sept. 27, 1985, p. 4.)[3] Senate Bill No. 1054 (1985–1986 Reg. Sess.) identified its purpose " 'to protect society by providing both a means for isolating these offenders and treatment for the underlying cause of their criminality.' " (Assem. Com. on Public Safety, Analysis of Sen. Bill No. 1054 (1985–1986 Reg. Sess.) as amended May 30, 1985, p. 2.) As the Act's findings and declarations further explained, the Legislature found that "in order to protect the public from those persons it is necessary to provide mental health treatment until the severe mental disorder which was one of the causes of or was an aggravating factor in the person's prior criminal behavior is in remission and can be kept in remission. [¶] . . . [S]everely mentally disordered prisoners should be provided with an appropriate level of mental health treatment while in prison and when returned to

---

  [3] In 1985, the Legislature passed tandem bills, Senate Bill No. 1296 (1985–1986 Reg. Sess.) and Senate Bill No. 1054 (1985–1986 Reg. Sess.), enacting the MDO Act. (Stats. 1985, ch. 1418, § 1, p. 5009 [adding § 2970]; Stats. 1985, ch. 1419, § 1, p. 5011 [amending § 2960].) The Legislature soon thereafter passed Senate Bill No. 1845 (1985–1986 Reg. Sess.) as a "cleanup measure," which among other things, renumbered the provisions in the MDO Act, corrected certain draft oversights, and added that written evaluations be provided to the district attorney. (Sen. Rules Com., Analysis of Sen. Bill No. 1845 (1985–1986 Reg. Sess.) as amended Aug. 12, 1986, p. 1, enacted as Stats. 1986, ch. 858, §§ 1–11, pp. 2951–2957.)

the community." (§ 2960.) In adopting such procedures, the Legislature highlighted the "danger to society" and the state's "compelling interest in protecting the public." (*Ibid.*)

Like other involuntary civil commitment schemes, the MDO Act's comprehensive statutory scheme—which itself took three bills to enact (see, *ante*, at p. 97, fn. 3)—represents a delicate balancing of countervailing public and individual interests. Among these interests is obviously the public's right to be safe and protected from identified dangerous and mentally ill ex-prisoners, who themselves are statutorily required to receive mental health treatment to keep their severe mental disorder in remission after being released on parole. (§ 2962.) Thus, we are aware that the balancing here involves factors not readily susceptible to quantification, and we must keep a broader perspective in mind to fashion a sufficient solution. (See *People v. Dias* (1985) 170 Cal.App.3d 756, 763 [216 Cal.Rptr. 295] [though petition for extended commitment under § 1026.5 did not comply with mandatory deadline, "defendant continues to present a substantial danger of bodily harm to others, neither defendant nor the public would benefit by defendant's release at this time"].)

As the high court has pronounced, states must ensure due process protections and safeguard liberty interests when a person is civilly committed. (*Addington v. Texas* (1979) 441 U.S. 418 [60 L.Ed.2d 323, 99 S.Ct. 1804]; *In re Howard N.* (2005) 35 Cal.4th 117, 127–128 [24 Cal.Rptr.3d 866, 106 P.3d 305] [civil commitment for persons under control of former California Youth Authority under Welf. & Inst. Code, § 1800].) "[C]ivil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection. [Citations.] Moreover, it is indisputable that involuntary commitment to a mental hospital after a finding of probable dangerousness to self or others can engender adverse social consequences to the individual. Whether we label this phenomena 'stigma' or choose to call it something else is less important than that we recognize that it can occur and that it can have a very significant impact on the individual." (*Addington, supra*, 441 U.S. at pp. 425–426.) "Nevertheless, '[s]tates have in certain narrow circumstances provided for the forcible civil detainment of people who are unable to control their behavior and who thereby pose a danger to the public health and safety.' (*Kansas v. Hendricks* (1997) 521 U.S. 346, 357 [138 L.Ed.2d 501, 117 S.Ct. 2072] . . . .) The high court has 'consistently upheld such involuntary commitment statutes provided the confinement takes place pursuant to proper procedures and evidentiary standards. [Citations.] It thus cannot be said that the involuntary civil confinement of a limited subclass of dangerous persons is contrary to our understanding of ordered liberty.' (*Ibid.*)" (*In re Howard N., supra*, 35 Cal.4th at p. 128.)

### 2. *Procedural requirements for civil recommitment under the MDO Act*

■ With this backdrop, we turn to the procedural requirements necessary to civilly recommit an MDO under the Act. As a condition of parole, a prisoner may be designated and civilly committed as an MDO for involuntary treatment of a "severe mental disorder"[4] if certain conditions are met. (§§ 2962, 2966; see also *In re Qawi* (2004) 32 Cal.4th 1, 23 [7 Cal.Rptr.3d 780, 81 P.3d 224]; *People v. Williams* (1999) 77 Cal.App.4th 436, 444 [92 Cal.Rptr.2d 1] (*Williams*).) ■ Section 2962 provides that a prisoner is subject to the MDO Act if: "(a) The prisoner has a severe mental disorder that is not in remission or cannot be kept in remission without treatment"; "(b) The severe mental disorder was one of the causes of or was an aggravating factor in the commission of a crime for which the prisoner was sentenced to prison"; "(c) The prisoner has been in treatment for the severe mental disorder for 90 days or more within the year prior to the prisoner's parole or release"; "(d)" a special team of mental health professional evaluated the prisoner and concluded that criteria (a), (b) and (c) above have been met, and that due to the severe mental disorder, the prisoner "represents a substantial danger of physical harm to others"; "(e)" the prisoner received a determinate sentence for the crime referenced in subdivision (b), and the crime is one of the enumerated crimes in subdivision (e). (§ 2962, subds. (a)–(e).) If such are found to exist, the prisoner may request a de novo hearing before the Board of Parole Hearings. (§ 2966.) If the Board of Parole Hearings concludes that the criteria are met, the prisoner may request a jury trial in the superior court. (*Ibid.*) "The standard of proof shall be beyond a reasonable doubt, and if the trial is by jury, the jury shall be unanimous in its verdict." (§ 2966, subd. (b); see *Williams*, *supra*, 77 Cal.App.4th at pp. 444, 458, fn. 10.)

■ Before an MDO's current commitment period expires, the district attorney may petition to extend that commitment by one year. (§ 2970.) To do so, the medical director of the state hospital, the community program director, or the Director of Corrections first "shall submit" to the district attorney a written evaluation of the prisoner "[n]ot later than 180 days" before the prisoner's termination of parole or release, "unless good cause is shown" for delay. (*Ibid.*) If the district attorney files a petition for continued involuntary treatment for one year (*ibid.*), the trial court will hold a hearing on the petition, and the trial "shall commence no later than 30 calendar days" before the time the prisoner would have been released, "unless the time is waived by the person or unless good cause is shown." (§ 2972, subd. (a).) If the MDO's

---

[4] "[S]evere mental disorder" is defined as "an illness or disease or condition that substantially impairs the person's thought, perception of reality, emotional process, or judgment; or which grossly impairs behavior; or that demonstrates evidence of an acute brain syndrome for which prompt remission, in the absence of treatment, is unlikely." (§ 2962, subd. (a).)

commitment is continued (§ 2972, subd. (c)), the district attorney may file subsequent petitions to extend the MDO's commitment in one-year increments. (§§ 2970, 2972(e).) "The recommitment proceeding shall be conducted in accordance with the provisions of this section." (§ 2972(e).)

At issue here, section 2972(e) provides: "*Prior to the termination of a commitment under this section*, a petition for recommitment *may* be filed to determine whether the patient's severe mental disorder is not in remission or cannot be kept in remission without treatment, and whether by reason of his or her severe mental disorder, the patient represents a substantial danger of physical harm to others." (Italics added.) Unlike sections 2970 and 2972, subdivision (a), section 2972(e) does not provide for a waiver and/or good cause exception. Section 2972(e) also "does not specify the number of days prior to expiration of the commitment in which the petition must be filed" by the district attorney. (*Zachary*, *supra*, 57 Cal.App.4th at p. 1031.) Moreover, the MDO Act, including section 2972(e), does not expressly provide for any type of sanction, such as dismissal, for untimely recommitment petitions.

After acknowledging guiding principles on the directory-mandatory distinction, which we discuss further below (see, *post*, at pp. 101–102), the Court of Appeal majority ultimately concluded that section 2972(e)'s time limit was mandatory because it was a "matter of substance rather than one of convenience." (See *Francis v. Superior Court* (1935) 3 Cal.2d 19, 28 [43 P.2d 300] (*Francis*).) While the 180-day and 30-day time limits (§§ 2970, 2972, subd. (a)), are intended to expedite resolution of *pending* recommitment petitions, the majority concluded that section 2972(e)'s "requirement that a petition to extend a commitment be filed, thereby *initiating* an action, before the commitment terminates is a matter of substance which, in our view, must be deemed mandatory." The majority discussed several decisions that arguably supported a contrary conclusion. (See, e.g., *Zachary*, *supra*, 57 Cal.App.4th 1026; see also *People v. Fernandez* (1999) 70 Cal.App.4th 117, 129 [82 Cal.Rptr.2d 469] (*Fernandez*).) It also found decisions interpreting other statutory schemes inapposite. Allen urges us to adopt the reasoning of the Court of Appeal majority. While we do not necessarily agree with all of the majority's reasoning, we do agree with the majority and Allen that the time restriction of this section is mandatory.

In this case, there is no question that the district attorney failed to comply with section 2972(e)'s mandatory time deadline—he filed a recommitment petition on January 21, 2004, over three months *after* Allen's commitment ended on October 14, 2003. His petition does not provide any explanation for the delay. As discussed above, we must decide the consequences of failing to comply with section 2972(e). Echoing the Court of Appeal majority, Allen argues that because section 2972(e) is mandatory, the district attorney's

failure to file a timely petition precluded the trial court from extending his commitment. The Attorney General disagrees the section is mandatory, claiming, instead, the court has authority to extend an MDO's commitment after it has expired because section 2972(e)'s time requirement is directory. The Attorney General also claims this statutory interpretation furthers important public policy interests, such as public safety. We first explain the directory-mandatory distinction, and the significance of each.

### B. *Directory or Mandatory Provision*

■ Generally speaking, "the 'directory-mandatory' distinction is concerned only with whether a particular remedy—invalidation of the ultimate governmental action—is appropriate when a procedural requirement is violated; even when invalidation is not appropriate, other remedies—such as injunctive relief, mandamus or monetary damages—may be available to enforce compliance with the statutory provision. Indeed, the availability or unavailability of alternative remedies may have an important bearing on whether a procedure is to be accorded 'directory' or 'mandatory' effect." (*Morris v. County of Marin* (1977) 18 Cal.3d 901, 909, fn. 4 [136 Cal.Rptr. 251, 559 P.2d 606], italics omitted (*Morris*).) The directory-mandatory distinction "does not refer to whether a particular statutory requirement is 'permissive' or 'obligatory.' " (*Id.* at p. 908; see also *Edwards v. Steele* (1979) 25 Cal.3d 406, 410 [158 Cal.Rptr. 662, 599 P.2d 1365] (*Edwards*).)[5] Although somewhat tautological, the principle is ostensibly or perhaps deceptively simple: "If the action is invalidated, the requirement will be termed 'mandatory.' If not, it is 'directory' only." (*California Correctional, supra*, 10 Cal.4th at p. 1145; see also *Morris, supra*, 18 Cal.3d at p. 909 [citing cases].)

■ "Whether a particular statute is intended to impose a mandatory duty is a question of interpretation for the courts." (*Nunn v. State of California* (1984) 35 Cal.3d 616, 624 [200 Cal.Rptr. 440, 677 P.2d 846] (*Nunn*).) We recognized long ago that "there is no simple, mechanical test for determining

---

[5] However, if a provision is mandatory, cases have held that the failure to comply with its requirements does not necessarily mean a court loses *fundamental* jurisdiction resulting in "an entire absence of power to hear or determine the case, an absence of authority over the subject matter or the parties." (*Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 288 [109 P.2d 942] ["jurisdiction" has many meanings]; *California Correctional Peace Officers Assn. v. State Personnel Bd.* (1995) 10 Cal.4th 1133, 1146 [43 Cal.Rptr.2d 693, 899 P.2d 79] (*California Correctional*)); 2 Witkin, Cal. Procedure (4th 3d. 1997) Jurisdiction, § 4, pp. 548–549 [explaining difference between "jurisdictional" and "mandatory"].) The high court has recently also recognized the difficulty making the mandatory/jurisdictional distinction. (*Bowles v. Russell* (2007) 551 U.S. 205 [168 L.Ed.2d 96, 127 S.Ct. 2360, 2366] [in a five-to-four decision, holding that "the timely filing of a notice of appeal in a civil case is a jurisdictional requirement"]; but see *Arbaugh v. Y & H Corp.* (2006) 546 U.S. 500, 510 [163 L.Ed.2d 1097, 126 S.Ct. 1235] [high court "clarified that time prescriptions, however emphatic, 'are not properly typed "jurisdictional." ' "].)

whether a provision should be given 'directory' or 'mandatory' effect." (*Morris, supra*, 18 Cal.3d at pp. 909–910, citing *Pulcifer v. County of Alameda* (1946) 29 Cal.2d 258, 262 [175 P.2d 1] (*Pulcifer*).) Unless the Legislature clearly expresses a contrary intent, time limits are typically deemed directory. (*California Correctional, supra*, 10 Cal.4th at p. 1145; see also *Garrison v. Rourke* (1948) 32 Cal.2d 430, 435 [196 P.2d 884] (*Garrison*) [time limit's mandatory effect must be "expressly provided or otherwise clearly intended"].)[6]

However, as in any case involving statutory interpretation, we must ascertain the legislative intent to determine what effect to give a statute's time requirement. (*Pulcifer, supra*, 29 Cal.2d at p. 262.) "The legislative intent can usually be determined from the statutory language." (*Nunn, supra*, 35 Cal.3d at p. 624.) "In the absence of express language, the intent must be gathered from the terms of the statute construed as a whole, from the nature and character of the act to be done, and from the consequences which would follow the doing or failure to do the particular act at the required time." (*Pulcifer, supra*, 29 Cal.2d at p. 262; see also *People v. McGee* (1977) 19 Cal.3d 948, 958 [140 Cal.Rptr. 657, 568 P.2d 382] ["courts look to the purpose of the procedural requirement to determine whether invalidation is necessary to promote the statutory design"].)

We begin with the language of section 2972(e) itself. (See *Nunn, supra*, 35 Cal.3d at p. 624.) As noted above, the section provides: "Prior to the termination of a commitment under this section, a petition for recommitment *may* be filed" to determine whether the MDO's severe mental disorder is not in remission. (Italics added.) The Attorney General contends that the term "may" demonstrates that section 2972(e) is directory. (See *Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 443 [261 Cal.Rptr. 574, 777 P.2d 610] ["the word 'may' is ordinarily construed as permissive, whereas 'shall' is ordinarily construed as mandatory"].) Therefore, the trial court's extension of Allen's commitment—notwithstanding the district attorney's untimely recommitment petition—is not void. We are not persuaded by the Attorney General's contention. Neither the word "may," nor the word "shall," is dispositive. (*Atkinson v. Elk Corp. of Texas* (2006) 142 Cal.App.4th 212, 227–228 [48 Cal.Rptr.3d 247] [" 'It is true that in statutes the word "may" is sometimes construed as "shall." But that is where the context, or the subject-matter, compels such construction' "].) Also, several Courts of Appeal

---

[6] Courts have also adopted various tests to determine the Legislature's "probable intent" regarding a statute's time requirements. (*Edwards, supra*, 25 Cal.3d at p. 410.) For instance, a time requirement is considered directory " 'unless a consequence or penalty is provided for failure to do the act within the time commanded.' " (*Ibid.*, quoting *Garrison, supra*, 32 Cal.2d at pp. 435–436.) Also, courts may also look to see if the statutory requirement " 'relates to matters material or immaterial—to matters of convenience or of substance.' " (*Francis, supra*, 3 Cal.2d at p. 28.)

have determined that certain deadlines under the MDO Act are directory despite the Legislature's use of the word "shall." (See, e.g., *Fernandez, supra,* 70 Cal.App.4th at p. 129 [§ 2970's 180-day deadline]; *Williams, supra,* 77 Cal.App.4th at p. 451 [§ 2972, subd. (a)'s 30-day deadline].)

More importantly, in the context of the statutory scheme, the term "may" does not signal whether section 2972(e)'s time requirement is directory or mandatory. Rather, it reflects the district attorney's *discretion* to file a recommitment petition—or not—once the MDO's current commitment is set to end. The petition under section 2972(e) seeks to determine whether to extend the existing commitment if the MDO's severe mental disorder is not in remission or cannot be kept in remission with treatment, and if the MDO "represents a substantial danger of physical harm to others." (§ 2972(e).) Thus, a district attorney, after receiving a written evaluation on the MDO's severe mental disorder, "may then file a petition with the superior court for continued involuntary treatment for one year." (§ 2970; see §§ 2972, subd. (a) ["The court shall conduct a hearing on the petition under Section 2970 for continued treatment"], 2972(e) ["recommitment proceeding shall be conducted in accordance with the provisions of this section"].)

The related provisions under the MDO Act supply additional support for the conclusion that the maximum term for each commitment is one year, and as such, a district attorney must petition for an MDO's recommitment within that one year. Section 2972, subdivision (c), provides that if a court or jury finds a prisoner's severe mental disorder is not in remission and as such, the prisoner represents a substantial danger of physical harm to others, the court-ordered "commitment shall be for a *period of one year* from the date of termination of parole or a previous commitment or the scheduled date of release from prison as specified in Section 2970. Time spent on outpatient status . . . shall not count as actual custody and shall not be credited toward the person's *maximum term of commitment* or toward the person's term of extended commitment." (Italics added; see also § 2970 ["The district attorney may then file a petition with the superior court for *continued involuntary treatment for one year*" (italics added)].) These provisions clearly reflect the Legislature intended the MDO's maximum term of commitment to be one year, which may be extended annually for additional one-year terms under the conditions of the Act.

Indeed, the drafters of the MDO Act recognized that "a prisoner could conceivably be 'treated' for the rest of his life as there is no limit on the number of times he may be recommitted to an inpatient facility." (Assem. Com. on Public Safety, Analysis of Sen. Bill No. 1054 (1985–1986 Reg. Sess.) as amended May 30, 1985, p. 4.) Thus, it is paramount that "[p]eriodic reviews are required because if the basis for a commitment ceases to exist,

continued confinement violates the substantive liberty interest in freedom from unnecessary restraint." (*Clark v. Cohen* (3d Cir. 1986) 794 F.2d 79, 86; see *Kansas v. Hendricks, supra*, 521 U.S. at p. 364 [Kansas civil commitment scheme provides similar yearly reviews].)

Among other things, the Attorney General argues that it would be inconsistent to allow for good cause or waiver exceptions from time requirements in sections 2970 and 2972, subdivision (a) (see, *ante*, at p. 100), while concluding the time for filing the extension in section 2972(e) is mandatory. We disagree. In *Williams*, the Court of Appeal concluded section 2972, subdivision (a)'s 30-day deadline to commence trial on a recommitment petition was directory; the practical purpose of the deadline is "to ensure a reasonable amount of time in which to conduct a trial before the defendant is to be released." (*Williams, supra*, 77 Cal.App.4th at pp. 450–451; see *People v. Kirkland* (1994) 24 Cal.App.4th 891, 913 [29 Cal.Rptr.2d 863].) In so holding, the Court of Appeal noted that section 2972, subdivision (a) did not expressly set any deadline for the *completion* of the trial; however, section 2972(e) provided a set deadline based on the MDO's release date. (*Williams, supra*, 77 Cal.App.4th at p. 452.) "The plain language of section 2972, subdivision (e), together with other provisions, reflects a legislative intent to prohibit the filing of a petition, and the initiation of commitment proceedings, *after* a parole period or previous commitment has expired." (*Id.* at p. 455.) Thus, the court's holding that the authorities need not strictly comply with the 30-day deadline (§ 2972, subd. (a)) was based in part on its understanding of the absolute deadline to begin the recommitment process—the termination of the current one-year commitment. (*Williams, supra*, 77 Cal.App.4th at pp. 452–455.)

■ Based on the foregoing, we conclude that the Legislature intended the deadline set forth in section 2972(e) to be mandatory, i.e., requiring the district attorney to file a recommitment petition *before* the MDO's current commitment term ends. The consequence for not complying with a mandatory requirement, as discussed above, is generally the "invalidation of the ultimate governmental action." (*Morris, supra*, 18 Cal.3d at p. 908, fn. 4; see, *ante*, at p. 101.) Here, that would mean invalidating the trial court's purported extension of Allen's recommitment and ostensibly releasing Allen into the community. The Attorney General, however, asserts that even if section 2972(e) is mandatory, the superior court retains "fundamental jurisdiction" to determine whether the missed time deadline limit violates Allen's due process rights to compel dismissal of the proceeding. We disagree that the Attorney General's approach would provide Allen an adequate remedy.

In this situation, determining whether an MDO's due process rights were violated by a delayed petition would often be futile. "[R]egardless of whether defendant's claim is based on a due process analysis or a right to a speedy trial not defined by statute, the test is the same, i.e., any prejudice to the defendant resulting from the delay must be weighed against justification for the delay." (*Scherling v. Superior Court* (1978) 22 Cal.3d 493, 505 [149 Cal.Rptr. 597, 585 P.2d 219], fn. omitted.) As this case demonstrates, more often than not, an MDO would be unable to show prejudice if his or her mental disorder is not in remission. For instance, the Attorney General asserts that—notwithstanding the district attorney's untimely petition—Allen has suffered no actual prejudice because he would have been recommitted anyway as he continues to suffer from his severe mental disorder. Nonetheless, Allen was denied his annual review under the MDO Act, which may be deemed prejudicial. However prejudice may be characterized here, Allen is entitled to some type of remedy, or more precisely, a resolution of his commitment status.

## C. *Remedy*

The Attorney General contends that if we conclude section 2972(e)'s deadline is mandatory, "no means to continue [Allen's] involuntary treatment as an MDO would exist." Our decision, however, will not necessarily result in Allen's release. Although Allen does not fall under the jurisdiction of the MDO Act, we agree with the Court of Appeal majority that Allen might still be involuntarily committed and treated under the LPS Act. (Welf. & Inst. Code, § 5000 et seq.)

### 1. *LPS Act*

#### a. *Background*

As brief background, in 1974 when the Assembly's Select Committee on Mentally Disordered Criminal Offenders conducted a public hearing, Assemblyman Frank Lanterman as chair acknowledged that the LPS Act, which was enacted in 1969, "was not designed to accommodate the mentally disordered criminal offender." (Assem. Select Com. on Mentally Disordered Criminal Offenders, Public Hearing on House Res. No. 88 (1973–1974 Reg. Sess.) testimony of Assemblyman Lanterman, p. 1.) Although the LPS Act's initial purpose was not to treat MDO's, the Legislature later added provisions and amendments "[t]o provide prompt evaluation and treatment of persons with serious mental disorders" among other private and public purposes (Welf. & Inst. Code, § 5001, subd. (b) [LPS Act's legislative intent]), and also included in the MDO Act a provision relying on the LPS Act to prevent an

inmate or parolee from premature or unintended release. (Pen. Code, § 2974 [on probable cause, Director of Corrections may place inmate/parolee in state hospital under LPS Act].)

Moreover, during that 1974 hearing before the MDO Act was enacted, one expert's suggestion was to add a provision "to the Penal Code commitment procedures so the arresting officer, who has reasonable cause to believe that the person has committed a minor crime because of a mental disorder, can take that person to a designated mental health facility instead of to jail. If the staff at the mental health facility agrees with the arresting officer that the person is apparently mentally ill, then he could be held on certification of the officer for three days and be provided the same services available to those who are mentally ill and dangerous. If he is found to be mentally ill during the observation period, charges could be dropped and the person treated in accordance with the provision of the Lanterman-Petris-Short Act." (Assem. Select Com. on Mentally Disordered Criminal Offenders, Public Hearing on House Res. No. 88 (1973–1974 Reg. Sess.) testimony of Dr. Lowry, pp. 47–48.) As the hearing and testimony demonstrate, the MDO Act and LPS Act share two significant common goals—the treatment of mentally disordered persons and the protection of the public. (See § 2960 [MDO Act's findings and declarations]; Welf. & Inst. Code, § 5001 [LPS Act's legislative intent].)

### b. *Procedural requirements under the LPS Act*

As relevant here, we recently discussed the series of temporary detentions and the appointment of conservatorships available under the LPS Act. (*Conservatorship of Ben C.* (2007) 40 Cal.4th 529, 541–542 [53 Cal.Rptr.3d 856, 150 P.3d 738] (*Ben C.*).) The LPS Act " 'limits involuntary commitment to successive periods of increasingly longer duration, beginning with a 72-hour detention for evaluation and treatment ([Welf. & Inst. Code,] § 5150), which may be extended by certification for 14 days of intensive treatment ([Welf. & Inst. Code,] § 5250); that initial period may be extended for an additional 14 days if the person detained is suicidal. ([Welf. & Inst. Code,] § 5260.) . . . [T]he 14-day certification may be extended for an additional 30-day period for further intensive treatment. ([Welf. & Inst. Code,] § 5270.15.) Persons found to be imminently dangerous may be involuntarily committed for up to 180 days beyond the 14-day period. ([Welf. & Inst. Code,] § 5300.) After the initial 72-hour detention, the 14-day and 30-day commitments each require a certification hearing before an appointed hearing officer to determine probable cause for confinement unless the detainee has filed a petition for the writ of habeas corpus. ([Welf. & Inst. Code,] §§ 5256, 5256.1, 5262, 5270.15, 5275, 5276.) A 180-day commitment requires a superior court

order. ([Welf. & Inst. Code,] § 5301.)' " (*Ben C.*, at p. 541, quoting *Conservatorship of Susan T.* (1994) 8 Cal.4th 1005, 1009 [36 Cal.Rptr.2d 40, 884 P.2d 988].)

The LPS Act's "carefully calibrated series of temporary detentions for evaluation and treatment" (*Ben C., supra,* 40 Cal.4th at p. 541), is obviously more complicated than the MDO Act's one-year commitments. (See §§ 2962–2972; see, *ante,* at pp. 99–100.) While the LPS Act asks whether as a result of a mental disorder, a person is a danger to self or *others* (see, e.g., Welf. & Inst. Code, §§ 5150, 5250, 5300)—the latter of which is similar to the MDO Act (Pen. Code, § 2970)—another salient question for detention under the LPS Act is whether the person is "gravely disabled" as a result of a mental disorder. (Welf. & Inst. Code, § 5008, subd. (h)(1).)[7] As relevant here, " 'gravely disabled' " means "[a] condition in which a person, as a result of a mental disorder, is unable to provide for his or her basic personal needs for food, clothing, or shelter." (Welf. & Inst. Code, § 5008, subd. (h)(1)(A); but see *id.,* § 5350, subd. (e) [not " 'gravely disabled' " if family, friends, or others indicate in writing they are willing and able to help provide for conservatee's personal needs].)

However, in addition to the somewhat piecemeal short-term detentions discussed above, a one-year conservatorship may be sought, similar to the one-year commitments under the MDO Act. (Welf. & Inst. Code, §§ 5350, 5361; Prob. Code, § 1400 et seq. [governing LPS Act conservatorships]; see also Welf. & Inst. Code, § 5352.1 [court-ordered temporary conservatorship of 30 days].) Conservatorship proceedings may only be initiated by the professional person in charge of the treatment facility, who recommends a conservatorship if the proposed conservatee is gravely disabled by a mental disorder. If the officer providing conservatorship investigation agrees with the recommendation, the officer may petition the superior court to establish a conservatorship. (Welf. & Inst. Code, §§ 5352, 5352.5.) Once established, a conservatorship terminates automatically at the end of one year, unless the conservator petitions to reestablish conservatorship "at or before the termination of the one-year period." (*Id.,* § 5362, subd. (b); see § 5361.)

---

[7] The LPS Act does not have a specific definition of "mental disorder." (See Welf. & Inst. Code, § 5008.2.) However, when a person's disorder is relevant under the LPS Act, "the historical course of the person's mental disorder . . . shall be considered when it has a direct bearing on the determination of whether the person is a danger to others, or to himself or herself, or is gravely disabled, as a result of a mental disorder. The historical course shall include, but is not limited to, evidence presented by persons who have provided, or are providing, mental health or related support services to the patient, the patient's medical records as presented to the court, including psychiatric records, or evidence voluntarily presented by family members, the patient, or any other person designated by the patient." (§ 5008.2, subd. (a).)

## 2. *Allen's status*

In April 2003, nearly six months before Allen's commitment was to terminate, the medical director of Napa State Hospital sent a letter to the district attorney recommending he seek the extension of Allen's recommitment, which was to end on October 14, 2003. The March 17, 2003 evaluation on Allen noted: He "has made little progress during the past year. His motivation level is poor and he is unable to get involved toward meeting discharge criteria due to his significant delusional and psychotic symptoms. [Despite] drug regimen changes, his response remains poor. . . . [¶] He is suffering from a major mental illness, not in remission, and still shows signs and symptoms of severe mental disorder. By reason of severe mental disorder he represents a substantial danger to himself and others. [¶] It is the recommendation of the treatment team that a petition be filed with the Superior Court for continued involuntary treatment for one year."

More recent events illustrating Allen's current mental state include: On November 2, 2005, a jury found the petition alleging Allen to be an MDO to be true, and Allen was ordered committed for another year until October 14, 2006. Another petition seeking to extend Allen's commitment to October 14, 2007, is currently pending. In a May 29, 2007 letter to the Santa Clara County District Attorney, the acting medical director of Napa State Hospital opined that Allen still suffers from a "severe mental disorder" under the MDO Act, and requested the district attorney file a petition for continued involuntary treatment under the Act.

Because Allen has been evaluated and treated only under the MDO Act up to this point, there has been no occasion to determine whether Allen would be subject to the requirements of the LPS Act. (See, *ante*, at pp. 106–107.) Thus, we underscore that our decision should not be construed as requiring Allen's release if he is still in need of mental health treatment. Assuming he still requires such treatment, we presume that responsible parties will take appropriate steps to ensure Allen receives custodial treatment, for as long as is necessary, under the LPS Act.

One final, important note: We urge district attorneys and other responsible parties to ensure that recommitment petitions are timely filed to avoid situations like this; likewise, we understand it is unrealistic to assume that there will be no late petitions. There may be good cause for the delay in some cases. Thus, we also urge the Legislature to recognize this reality and specifically address the consequences of untimely petitions.

## DISPOSITION

We affirm the Court of Appeal's judgment.

George, C. J., and Kennard, J., Baxter, J., Werdegar, J., Moreno, J., and Corrigan, J., concurred.