Filed 8/30/22  P. v. Rivera CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ROMAN RIVERA,<br><br>Defendant and Appellant. | B317680<br><br>(Los Angeles County<br>Super. Ct. No. ZM007559) |

APPEAL from an order of the Superior Court of Los Angeles County, Ronald Owen Kaye, Judge.  Affirmed.

Gerald J. Miller, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Eric J. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

————

## INTRODUCTION

Appellant Roman Rivera appeals an order recommitting him to the Department of State Hospitals for continued involuntary treatment as a mentally disordered offender (MDO). (Penal Code[1] sections 2962 et seq.) We conclude, among other things, substantial evidence supports the trial court's finding that appellant poses a substantial danger of physical harm to others because of his severe mental disorder. (§ 2972, subd. (c).) We affirm.

## FACTS AND PROCEDURAL BACKGROUND

1.    *Appellant's Convictions and Civil Commitments*
In 1998, a jury convicted appellant of one count of committing lewd and lascivious acts on a child under the age of 14 (§ 288, subd. (a)), and one count of indecent exposure (§ 314.1). In 1999, appellant was hospitalized at Patton State Hospital after being found incompetent to stand trial. In 2001, he was admitted to Atascadero State Hospital as an MDO. In 2014, he was transferred to Coalinga State Hospital where he remains in custody for treatment. Appellant's MDO commitment has been extended each year, and he has remained in custody since 2004.

2.    *Petition for Commitment as an MDO*
In July 2021, the People filed a petition to extend appellant's MDO commitment for an additional one-year term. (§ 2970.) On August 23, 2021, appellant denied the petition and waived his right to a jury trial. A bench trial on the petition was

---

[1]    Undesignated statutory references are to the Penal Code.

held on October 20, 2021.  The parties stipulated appellant was convicted of lewd or lascivious acts with a child under the age of 14 (§ 288, subd. (a)) and indecent exposure (§ 314.1).

3.    *The MDO Trial*

The People presented testimony from Vanessa Lee and Dr. Gordon Plotkin.

a.    <u>Vanessa Lee</u>

Vanessa Lee is a licensed clinical social worker at Coalinga State Hospital.  Lee meets with appellant monthly for updates on his paperwork and to assess his well-being and group status.  She sees appellant around the hospital four days a week, such as when he is performing his janitorial work.

Lee testified appellant is "polite," "speaks when spoken to," and reports "anything out of the ordinary."  She has observed appellant responding to internal stimuli while he is working, including mumbling to himself, and pacing the hallways as a coping mechanism.  Since 2016, when Lee was assigned as appellant's social worker, appellant has adhered to his medications and has not been involuntarily medicated.  Lee has not been informed of any inappropriate sexual behavior or acts of violence involving appellant.

Lee leads the Managing Anger and Wellness Recovery Action Plan (WRAP) groups at the hospital.  She testified the hospital's Sex Offender Treatment and Substance Abuse groups have been suspended since early 2020 because of the COVID-19 pandemic.  Managing Mental Illness, WRAP, and Managing Anger groups, however, were still offered weekly.  Lee testified that with the WRAP group, patients are "supposed to know their diagnoses, their symptoms . . . they want to identify who their

3

support people will be once they discharge from the hospital so that they could give a copy of the draft plan to their support people in case of relapse. And the support people are expected to help them with whatever the WRAP plan determines."

Lee testified she reminds appellant weekly of the clinical groups she facilitates. According to Lee, appellant has not attended either the Managing Anger or WRAP treatment groups. Appellant told Lee he attends Managing Mental Illness, but Lee testified his attendance is "sporadic, maybe once or twice a month." Prior to its suspension in 2020, appellant did not attend the Sex Offender Treatment group or therapy. He told Lee "he didn't want to."

A day before his October 2021 trial, Lee spoke with appellant. She asked appellant what his plans were in the event he was discharged from the hospital. Appellant indicated he would like to go to the conditional release program (CONREP). Lee told appellant that to go to CONREP he must attend "groups, take [his] meds, and be on good behavior." Appellant told Lee he would start going to groups and he would take his medications. That day, Lee also asked appellant whether he heard voices. Appellant told Lee the last time he heard voices was "last year" in 2020.

b.   Dr. Gordon Plotkin

Dr. Gordon Plotkin, a forensic psychiatrist, interviewed appellant in November 2020 and August 2021 to determine if he satisfied the MDO criteria under section 2970. Before his October 2021 testimony, Dr. Plotkin reviewed his previous November 2020 MDO report, as well as appellant's hospital chart and "psychiatric and social history" reports.

4

Dr. Plotkin opined appellant suffers from schizophrenia, which "qualifies as a severe mental disorder by itself." Appellant's schizophrenia is not in remission. His schizophrenia symptoms include auditory hallucinations, delusions, disorganized thought process, negative symptoms of constrictive affect or emotions display, and anhedonia. Dr. Plotkin testified appellant is still experiencing auditory hallucinations and he continues to suffer from delusions and disorganized thinking noted in his initial November 2020 interview. Appellant's delusions include the belief that he is God or Jesus and that he has talked to angels.

Dr. Plotkin further diagnosed appellant with pedophilia and exhibitionism. The pedophilia diagnosis is "based on [appellant's] prior actions, his commitment offense." The exhibitionism diagnosis is "based on observed behaviors in the hospital." Appellant has acknowledged he has "masturbated in the hospital, that he has exhibited himself before, and acknowledged that that was part of the crime." Dr. Plotkin testified the last time appellant openly masturbated while in custody was "at least ten years ago."

According to Dr. Plotkin, the self-history appellant provides is "extremely variable." With respect to his commitment offenses, appellant acknowledged in his first interview with Dr. Plotkin that he "[touched] the butt of an underage girl." In his second interview, appellant was a "little different in his presentation. He talked about how he was dancing at a park and that he touched her butt during the dancing, but there's no data that suggests that that's accurate." Similarly, appellant acknowledged and also denied drinking alcohol when he committed that offense. Additionally, appellant indicated "he

5

never had psychiatric treatment before" his sexual battery offense, but also "he was at . . . psychiatric hospital[s] . . . prior to the crime." Appellant acknowledged and also denied taking psychiatric medication before his arrest.

With respect to whether appellant believed his mental illness played a role in his qualifying offenses, Dr. Plotkin testified appellant's responses "ranged anywhere from 'I don't have a mental illness, I have no symptoms, and I didn't commit the crimes' to having auditory hallucinations at the time of the sexual assault and various answers in between there." Appellant also indicated he had not heard voices since his offenses, but later reported hearing voices a month before his interviews with Dr. Plotkin.

As to appellant's current psychotropic medications, Dr. Plotkin testified appellant "was very vague about what he was taking, why he was taking it, if he would take it." Appellant's responses "[ranged] from understanding he's taking medications for a mental illness to . . . he doesn't have a mental illness, and that if he wasn't in the hospital, he wouldn't take medications." Dr. Plotkin "prompted many of [appellant's] answers" on whether he would take his psychotropic medications if discharged from the hospital because appellant "was clearly ambivalent about giving . . . a direct answer." Ultimately, appellant told Dr. Plotkin "he would not take them if he left the hospital." Dr. Plotkin explained if appellant were to cease his medications, his auditory hallucinations and delusions would exacerbate and "become much more relevant to his regular . . . daily behaviors. He'd be controlled by those psychotic symptoms and would likely act out in numerous ways." Additionally, Dr. Plotkin testified

6

appellant is on "a pretty high dose of the medication and [is] still having symptoms."

Dr. Plotkin testified appellant denied he was currently attending any form of substance abuse treatment group. Appellant told Dr. Plotkin "he knew that [substance abuse treatment] was required and that CONREP would be unlikely to take him if he wasn't with that group and other groups."

Dr. Plotkin opined appellant represents "a substantial danger of physical harm to others." He based his conclusion on the following: appellant was still experiencing "the same [active psychotic symptoms of voices and delusions] that he had when he committed the crimes." According to Dr. Plotkin, these symptoms "were controlling [appellant's] behavior" during his commitment offenses and "giving him commands, telling him that he should do things in the delusions, that it was okay for him to act out." Appellant is unable to explain "to what extent his symptoms are present." Appellant "has little or no insight into his mental illness, his symptoms, his need for treatment, [and] his need for compliance." Finally, appellant has also made "very slow progress at the hospital and is not very different than when he was first treated."

Dr. Plotkin's opinion as to appellant's dangerousness was not influenced by the fact that appellant had not engaged in any "overtly violent" acts since his commitment as an MDO. Dr. Plotkin explained appellant's behaviors were "really never . . . overtly violent. They're really violence towards the victims who take his acts as threatening such as exposing himself, touching them inappropriately, masturbating in public." Additionally, appellant does not understand that he should not engage in such behaviors or that they constitute crimes.

The People asked Dr. Plotkin how appellant's pedophilic and exhibitionist disorder factored into his opinion that appellant is presently a danger to others due to his schizophrenia. Dr. Plotkin testified "they're all related. His schizophrenia has active psychotic symptoms of voices and delusions. I believe that those are what either precipitated the other crimes or were aggravating factors in the other crimes. His [lack of] impulse control is related to his symptoms . . . . And he can't differentiate between the symptoms when they're giving him commands or convincing him of delusions between reality, so he feels free to do actions based on those."

Appellant's failure to complete sex offender treatment influenced Dr. Plotkin's opinion as to appellant's present dangerousness as well. Dr. Plotkin testified sex offender treatment is "is designed to give the person insight into many parts of that offense . . . . It ranges anywhere from understanding the victim's experience during those crimes," "understanding what may precipitate a similar crime or put him in a situation that may increase risk," and "how to avoid those actions if he gets a command hallucination or delusion." Dr. Plotkin opined that "lifelong [appellant is] going to have psychotic symptoms," so he "would need to be able to cope with those [symptoms] and identify the drives in order to reduce his risk of recidivism and he can't even have that conversation." Dr. Plotkin asked appellant what he had learned in the sex offender treatment and therapy he has attended. "[E]ven in prompting, the only thing [appellant] told [me] is to stay away from girls" which, according to Dr. Plotkin, is not "an adequate level of insight" nor "a possibility."

8

Finally, Dr. Plotkin testified Coalinga State Hospital provided the appropriate level of care for appellant. Before moving appellant to a lower level of care, such as CONREP, Dr. Plotkin testified he "would like to see [appellant] participate in the treatment groups. [Appellant] would immediately be revoked from outpatient status if he was sent to CONREP because he's not compliant with treatment groups."

       c.     <u>Dr. Natalie Do</u>

Appellant presented testimony from Dr. Natalie Do. Dr. Natalie Do was hired as a staff psychiatrist at Coalinga State Hospital in 2016. As appellant's treating psychiatrist, Dr. Do meets with appellant's psychologist, social worker, and other treatment doctors. Dr. Do testified in appellant's previous MDO recommitment trial in March 2021. At that time, Dr. Do testified appellant's mental illness was in remission because he was compliant with his medication. Additionally, in March 2021, Dr. Do testified appellant could be a decent candidate for CONREP with "some more supervision."

At the most recent trial in October 2021, Dr. Do testified she meets with appellant monthly to discuss his symptoms, group attendance, and goals in the event he is discharged from the hospital. According to Dr. Do, "it's the same conversation, and [appellant] still is not doing anything that has been advised to him on how to meet the barriers for discharge. [¶] . . . And now this year we're back, and we're still talking about how he hasn't been going to groups and doing things that need to be done in order to possibly have a chance at going to CONREP too."

When asked whether she still believes appellant's mental illness is in remission, Dr. Do testified "[she] meant to say that he was stable." As of October 2021, Dr. Do opined appellant's

mental illness is still stable because of his medications. Dr. Do opined CONREP is still a viable option for appellant. She testified, "To be perfectly honest, I'm disappointed that in the year that has . . . gone by, nothing has changed in terms of what we had told him that he needed to work on. . . . [A]fter court last year, I had talked to Mr. Rivera about his goal of CONREP and telling him to go to groups, and whatnot, and that's still . . . has not happened." Based on her discussions with appellant's treatment team, Dr. Do opined CONREP would want appellant to do a sex offender treatment group, and a substance abuse treatment group. She acknowledged sex offender and substance abuse treatment groups have not been offered in the last year, and she does not presently know CONREP's requirements.

Dr. Do testified she did not "feel comfortable predicting whether or not [appellant would] be dangerous in the future." She acknowledged appellant has not engaged in any acts of violence or any other inappropriate sexual behavior since she began treating him. However, Dr. Do testified it was appropriate to diagnose someone with exhibitionism and pedophilia under the DSM-5 based on the individual's history alone.

### d.    The Prosecution Rebuttal Evidence

Dr. Plotkin listened to Dr. Do's testimony. He testified Dr. Do's testimony strengthened his opinion, and "confirmed [appellant's] noncompliance with groups and lack of intent to participate in treatment."

### e.    Closing Arguments

At the close of testimony, the trial court heard argument from counsel. Both counsel agreed the primary issue was

10

appellant's present dangerousness as a result of his diagnosis of schizophrenia.

The prosecutor argued "the basis of why [appellant] still is presently dangerous is because of the fact that he would immediately decompensate psychiatrically if discharged to a lower level of care." Relying on Dr. Plotkin's testimony, the prosecutor noted appellant's lack of insight into his mental illness, and his admission to Dr. Plotkin he would not "follow up with psychiatric treatment" nor "[take] his psychiatric medications" if released from the hospital. As a result, appellant would decompensate "in an unstructured setting, [which] would make him a danger to others." Additionally, the prosecutor argued that because there were no children available to appellant in the hospital, "there [were] no children around to act out on." Finally, the prosecutor noted appellant had neither completed nor appropriately participated in Sex Offender, WRAP, Managing Anger, and Managing Mental Illness treatment.

Defense counsel noted appellant's diagnosis stemmed from convictions suffered over 20 years ago, and appellant has been medically compliant, has not required additional medications since at least 2016, and has not engaged in any recent acts of violence or inappropriate sexual behavior.

f.    The Trial Court's Ruling

The trial court found as follows:

"I'm going to find that without any discharge plan whatsoever, with ample evidence that he's suffering auditory hallucinations, and that there is nothing in the record that suggest, other than his history—but there's nothing affirmatively that he represented 'I will stay on my meds.' I'm going to find that with a complete lack of a discharge plan and absolutely a

11

nonproactive effort to get involved in groups, that I do—and when I look at substantial danger, I don't look at substantial danger that he's going to hit somebody or touch somebody.

"I really believe that the substantial danger could be from the exhibitionism and that—I mean, I don't really feel that strong about 20 years ago touching a minor's buttocks. I just don't. I think it's a terrible violation of that minor, but the concept that he could be exhibiting himself in a public forum when he's not medicated and that children or other really vulnerable folks are going to be privy to that, I do think it's a danger. I don't think I'm required to find the danger is only going to be physical. I think psychological is sufficient."

The prosecutor directed the court's "attention to the third element which does require 'presently represents a substantial danger of physical harm to others.' " "It's a physical danger not purely a psychological danger."

The court replied: "It's just I have no idea where he's going to go. I have no idea. It's not like I have any idea that he can survive as a homeless person. It's not like I have any idea that he has family. It's not like I have any idea that he's going to take any advantage of any kind of services. There's just nothing in the record.

"And I just think to have an individual suffering from auditory hallucinations who Dr. Plotkin definitively stated when he was off his medications prior to the predicate offense, that's what triggered this conduct, I just . . . believe that without anything to establish any kind of safety net whatsoever that I think the People have met their burden.

"So at this juncture, the court finds that—beyond a reasonable doubt that the respondent by reason of a severe

mental disorder represents a substantial danger of physical harm to others. [¶] Thank you for that clarification, Mr. Schultz. [¶] The court finds the petition is true and is sustained pursuant to Penal Code section 1026.5."

The prosecutor clarified the relevant MDO statute was section 2970.

The court replied: "Oh. 2970." "Pursuant to Penal Code [section] 2970. The court finds respondent has a severe mental disorder that is not in remission and by reason of a mental disorder represents a substantial danger of physical harm to others."

Appellant filed a timely notice of appeal on December 6, 2021.

## DISCUSSION

Under the MDO Act (§ 2960 et seq.), a prisoner adjudicated an MDO may be civilly committed during and after parole if certain conditions are met. (See §§ 2962, 2966.) The People, represented by the district attorney, may file a petition for the MDO's continued involuntary treatment for a period of one year. (§§ 2970, 2972, subds. (a)–(c).) Thereafter, the district attorney may petition to extend that commitment in one-year increments. (§ 2972, subd. (e).) (*People v. Allen* (2007) 42 Cal.4th 91, 94.)

To secure a one-year extension, the People must prove, beyond a reasonable doubt, that (1) the person continues to have a severe mental disorder; (2) the person's mental disorder is not in remission or cannot be kept in remission without treatment; and (3) by reason of this disorder, the person continues to represent a substantial danger of physical harm to others. (§ 2972, subd. (c).) At a recommitment hearing, the issue is

13

whether the defendant's "current condition justifie[s] extension of his commitment." (*People v. Cobb* (2010) 48 Cal.4th 243, 252.)

"In considering the sufficiency of the evidence to support MDO findings, [we] must determine whether, on the whole record, a rational trier of fact could have found that defendant is an MDO beyond a reasonable doubt, considering all the evidence in the light which is most favorable to the People, and drawing all inferences the trier could reasonably have made to support the finding." (*People v. Clark* (2000) 82 Cal.App.4th 1072, 1082.)

Appellant cites *People v. Gibson* (1988) 204 Cal.App.3d 1425 (*Gibson*) for the proposition "that the element of dangerousness constitute[s] a separate and independent requirement that . . . could not be based exclusively on either the existence of the prisoner's mental illness or the role of the illness in the underlying offense." He argues the trial court's findings that appellant is currently dangerous violate the principles set forth in *Gibson*.

We disagree. *Gibson* addressed a former version of the MDO statute. The Legislature has since amended the MDO law to require proof that a defendant represents a substantial danger of physical harm to others prior to commitment or recommitment to an inpatient facility or outpatient program. (*People v. Robinson* (1998) 63 Cal.App.4th 348, 450.) In any event, Gibson does not aid appellant because the finding that appellant currently represents a substantial danger of physical harm is based on more than the mental disorder itself or its role in appellant's commitment offense.

Here, Dr. Plotkin testified appellant suffered from schizophrenia, pedophilia and exhibitionism, was not in remission, and represented a substantial danger of physical harm

to others. He based his conclusions on appellant's lack of insight into his mental illness, his symptoms, and his need for treatment and medical compliance; lack of impulse control; and failure to complete his treatment plan, including substance abuse, sex offender, WRAP and managing mental illness groups. The evidence also showed that despite appellant's compliance with his medication plan, he continued to exhibit the same symptoms responsible for his commitment offenses. Further appellant admitted he would neither participate in treatment nor take medication if discharged from the hospital to a lower level of care. Without appellant successfully completing his treatment programs, Dr. Plotkin believed appellant lacked the skills to manage his symptoms. If appellant ceased taking his medication in an unstructured setting, he would decompensate to the extent he would "be controlled by [his] psychotic symptoms and would likely act out in numerous ways." We find this was substantial evidence to support the trial court's order for recommitment. (See *People v. Bowers* (2006) 145 Cal.App.4th 870, 879 [a single opinion by a psychiatric expert that a person is currently dangerous due to a severe mental disorder can constitute substantial evidence to support the extension of an MDO commitment]; see also *People v. Zapisek* (2007) 147 Cal.App.4th 1151, 1165.)

Appellant maintains Dr. Plotkin and the trial court improperly relied on appellant's "past acts" because a commitment order "must be based on the individual's current rather than past behavior or condition." Under the MDO statutes, however, substantial danger of physical harm "does not require proof of a recent overt act." (§ 2962, subd. (g).) Rather, substantial danger of physical harm "appears to mean a

15

prediction of future dangerousness by mental health professionals." (*In re Qawi* (2004) 32 Cal.4th 1, 23-24.) In addition to appellant's current state of mind, Dr. Plotkin properly considered appellant's past acts because they were relevant in determining whether appellant's condition, at the time of his recommitment hearing, rendered him dangerous to others. (*People v. Pace* (1994) 27 Cal.App.4th 795, 799 (a mental health professional, when assessing a defendant's risk of physical harm to others, "should take into account the prisoner's entire history . . . . This includes prior violent offenses as well as the prisoner's mental health history."].) The trial court could properly rely on Dr. Plotkin's testimony. (*People v. Ward* (1999) 71 Cal.App.4th 368, 374 ["where the trier of fact is required by statute to determine whether a person is dangerous or likely to be dangerous, expert prediction may be the only evidence available"].)

Appellant's claim that the trial court "ignored the uncontroverted evidence" that he "was stable and medically compliant, showed no symptoms of pedophilia, had not engaged in any recent acts of violence or inappropriate behavior, and that [he] recognized the need to attend groups if he wished to be released or transferred to CONREP" does not undermine our conclusion. The uncontroverted evidence appellant outlines pales against other substantial evidence that appellant was still delusional and unwilling to continue his medical treatment outside the hospital.

Appellant next argues the trial court "misstated and misapplied the 'substantial danger' requirement." In support of his argument, he notes the trial court misidentified the relevant MDO statute (§ 2970) as section 1026.5, and erroneously held

that "psychological rather than physical harm was sufficient to support a finding of dangerousness." He claims the trial court improperly relied on "appellant's exhibition and acts of openly masturbating while in the hospital" to support its holding of "psychological harm."

We agree the statute requires the People to prove a substantial danger of physical, not psychological, harm. (*People v. Harrison* (2013) 57 Cal.4th 1211, 1227.) We find the trial court's initial misstatement of the governing statute does not compel reversal. After the prosecutor corrected the court on the requirements of the operative statute, the trial court explicitly found a risk of physical harm, citing the proper statute. And, as discussed above, sufficient evidence other than appellant's exhibition and public masturbation at the hospital supports the trial court's finding that appellant posed a substantial danger of physical harm to others.[2]

Finally, the trial court did not "improperly [shift] the burden of proof" to appellant to "show that he could safely survive if released." In remarking that "I have no idea where [appellant's] going to go," because there's "just nothing in the

_____

[2]     Thus, insofar as appellant suggests the trial court was required to amend its findings after the prosecutor's correction that a "physical [danger or harm] was required," we disagree. As defendant waived his right to a jury trial, the trial court presiding over his MDO recommitment proceeding sits as the trier of fact. As the trier of fact, the trial court is not required to make explicit findings of fact or conclusions of law. (§ 1167 [a trial court sitting in place of a jury may enter a general verdict]; *People v. Williams* (1999) 77 Cal.App.4th 436, 457 [MDO recommitment proceedings are civil proceedings, incorporating both civil and criminal procedural rules].)

record" that indicates whether appellant "can survive as a homeless person," "has family," an adequate "safety net" or whether appellant will "take any advantage of any kind of services," the trial court was merely commenting on the evidence before it. It is also just as likely the trial court was commenting on evidence presented by the People that appellant has failed to complete his necessary treatment plan, including the WRAP group, which helps patients "identify who their support people will be once they discharge from the hospital." And further, in granting the People's section 2970 petition extending appellant's involuntary commitment as an MDO, the trial court explicitly stated "the People have met their burden." We agree with the trial court.

## DISPOSITION

The order extending appellant's involuntary MDO commitment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


STRATTON, P. J.


We concur:


GRIMES, J.          WILEY, J.


18