Filed 9/28/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br>        Plaintiff and Respondent,<br>v.<br>CHARLES JOHNSON,<br>        Defendant and Appellant. | A159208<br><br>(Alameda County<br>Super. Ct. No. 948224MH) |

Charles Johnson appeals from the trial court's order extending his involuntary commitment at Napa State Hospital as a mentally disordered offender (MDO) for one year, until December 2020.  He contends (1) the trial court misapplied the legal standard for assessing the likelihood that he would represent a substantial danger of physical harm, and (2) substantial evidence did not support the court's commitment extension order.  Because we conclude substantial evidence does not support the order extending appellant's MDO commitment, we shall reverse.

**PROCEDURAL BACKGROUND**

In February 1990, appellant was convicted of assault with force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(1).)[1]  He served nine years in prison before being paroled as an MDO to Atascadero State Hospital in 1999.  The following year, he was civilly committed to Napa State Hospital under the MDO Act (§ 2960 et seq.).  He was twice released as an

_____

[1] All further statutory references are to the Penal Code unless otherwise indicated.

1

outpatient in the Conditional Release Program (CONREP) for significant periods of time—from 2004 to 2008, and from 2008 to 2014—but was returned to the hospital each time after he went absent without leave (AWOL).

Most recently, following several one-year commitment extensions, the district attorney filed a petition on August 7, 2019, to again extend appellant's commitment. Following a court trial, the trial court granted the petition and ordered appellant's MDO commitment extended for one year, until December 3, 2020.

On December 18, 2019, appellant filed a notice of appeal.

## FACTUAL BACKGROUND

The following evidence was presented at appellant's commitment extension trial, which took place in December 2019, when appellant, who is schizophrenic, was 69 years old.[2]

Rafael Chang, a case manager for Alameda County CONREP, testified that he had attempted to meet with appellant in October 2019, at Napa State Hospital, as part of an evaluation of whether appellant should again be released for outpatient treatment under CONREP. Appellant refused to meet with him. Appellant had also refused to meet with him in April and October 2018, and April 2019.

Based on his review of appellant's records, Chang did not believe appellant was currently suitable for outpatient treatment with CONREP because he had not been participating in his groups in the hospital. He had a 29 percent participation rate, and CONREP required at least 80 percent

---

[2] At trial, counsel stipulated to a "*Sanchez* waiver," to allow for admission of records containing case-specific hearsay. (*People v. Sanchez* (2016) 63 Cal.4th 665.)

participation for MDO clients. In addition, appellant did not believe he had a mental illness or that he needed medication. CONREP depends on its clients' willingness to cooperate and take their medications. Since appellant was refusing to meet with Chang, it was hard for Chang to recommend him for release.

Chang also testified that he "could not safely say that [appellant] would not be a danger to the community." This opinion was based on appellant's underlying offense, which took place in 1990, when appellant was 39 or 40 years old. During that offense, he struck "a woman he did not know repeatedly from behind with a board causing injury that required 19 stitches and [caused] a broken wrist. He was delusional at the time, believing she was a renter that owed him money." When asked how the underlying offense played into his assessment that appellant would potentially be dangerous if he were in the community, Chang responded that appellant "could quickly decompensate without taking his medications, especially if he believes he does not have a mental illness or he requires medication." On cross-examination, Chang testified that he did not recall seeing any other instances of violence in appellant's medical records.

Chang further testified that CONREP records showed that appellant had been released to CONREP supervision in 2003, and was temporarily returned to the hospital after he went AWOL from CONREP in 2008. Several months later, after he was stabilized, he was again released into CONREP. Appellant's records did not show any incidents of violence during that period in 2008, when he was AWOL from CONREP. Then, from 2008 to 2014, appellant was in the community under CONREP supervision with "an unremarkable record," during which time he essentially complied with

3

CONREP's terms and conditions and there were no incidents of violence or aggression.

Chang testified that in January 2014, while again participating in CONREP, appellant was hospitalized due to a medical condition and underwent procedures that he did not agree with. This caused him to have an increase in symptoms of paranoia and to leave the hospital against medical advice. Three days later, he went AWOL from CONREP. Some two months later, in March 2014, a CONREP staff member located appellant in a soup kitchen. He was "delusional, paranoid, not on any medications," and was taken into custody by the Alameda County Sheriff's Department. It was assumed that he had not taken any of his psychiatric medications during those two months, since he did not have access to them. Over the two-month AWOL period, there was again no record of any violent or aggressive behavior.

In conversations with CONREP employees after he was located at the soup kitchen, appellant said that he was sleeping in the park and he declined their offer of housing and continued participation in CONREP because he wanted to continue sleeping in the park. Chang acknowledged on cross-examination that CONREP records reflected that appellant was "amicable" during that conversation with CONREP staff and that, when the police arrived to arrest him and return him to confinement, he did not resist arrest and was, in fact, friendly, nodding in recognition from the back of the police car to a CONREP employee he knew.

Dr. Hugo Schielke, who testified as an expert in the field of psychology, qualified to render an opinion regarding mental disorders and diagnosis, had been appellant's treating psychologist for the previous three or four months. Because appellant mostly stayed in his room and kept to himself,

4

Dr. Schielke did not encounter him often on a day-to-day basis, but did see him occasionally at treatment conferences.

Dr. Schielke had reviewed appellant's psychiatric and medical records. Based on that review and his interactions with appellant, he opined that appellant is schizophrenic, with symptoms that include paranoid delusions and flat affect. Because he was taking psychiatric medications, appellant primarily displayed "negative symptoms" of schizophrenia, such as the lack of affect, lack of movement, and disengagement. Since appellant did not interact much, Dr. Schielke had not observed appellant with "full delusions." But he did seem to have an inaccurate understanding of things and a lack of clarity of thought, which could be influenced by his schizophrenia.

Specifically, appellant did not fully recognize that he had a mental health issue and symptoms. Nor did he understand that CONREP was responsible in the past and would be responsible in the future for his care and treatment. Appellant did not believe CONREP should have called the police when he went AWOL, and he seemed confused and "frustrated with the series of events that have happened." In addition, appellant did not attend groups regularly, with overall attendance in the 20 percent range. Appellant did not think he needed to be in the hospital and did not want to go back to CONREP "because of how things unfolded." He was not motivated to participate in group treatment, which is important because it helps patients to understand and plan for their symptoms and work toward release.

Dr. Alaric Frazier, a staff psychiatrist at Napa State Hospital, testified as an expert in the criteria for MDO commitment. Dr. Frazier had been appellant's treating psychiatrist since August 2019. His responsibilities were to evaluate appellant and prescribe medication. Dr. Frazier had most recently conducted a 20-minute interview of appellant on October 31. Before

that, he had seen appellant on two occasions while appellant was under his care.  In preparation for his testimony, Dr. Frazier had reviewed appellant's psychiatric and medical records.

Based on his interactions with appellant, including the most recent clinical interview and his review of appellant's medical/psychiatric records, Dr. Frazier opined that appellant met the criteria as an MDO.  First, he believed appellant suffers from schizophrenia, a severe and chronic mental disorder.  Second, he believed that appellant's schizophrenia was "in partial remission," by which he meant that appellant "had severe delusions when he is not medicated and had delusions at the time of this crime."  At present, appellant had some delusions, but some had "gone away."  In addition, appellant's thought processes at the time of the underlying crime had been "very disorganized."  His current thought process was "more organized but is not what we call linear logical, which people without schizophrenia would show."

Dr. Frazier believed that appellant's schizophrenia played a significant role in the underlying offense and that the reason appellant "focused on the victim was because of his delusions; that he believed she was occupying a facility that he owned; and when he asked her to leave and pay him the rent and give him the keys back, she wouldn't do so; therefore, he hit her with the board."

In addition to his ongoing disorganized thought process, appellant still had delusions.  For example, he did not believe he committed the underlying offense; he would say that it was another Charles Johnson or someone who looked like him.  He also believed he was sent to Napa State Hospital "because some guy in Santa Rita wanted to collect a reward."  These ongoing symptoms were why Dr. Frazier believed appellant was only in partial

6

remission.  Dr. Frazier did not believe appellant could be kept in even this partial remission without continued treatment.  He was not voluntarily following his treatment plan, including attending psychosocial treatment groups to learn more about his mental illness and triggers.  His attendance at groups had been about 26 percent over the past year.  To advance to level two in the hospital, he would need at least 60 percent attendance and for level three, at which point release to CONREP would be possible, he would need 80 percent attendance.

Third, Dr. Frazier believed appellant presently represented a substantial danger of physical harm to others as a result of his severe mental disorder.  This opinion was based in part on the 1990 offense, which showed that when appellant "becomes very delusional, he will act out and in sometimes violent manners—in a violent manner."  Appellant's lack of insight also supported this opinion because appellant does not believe that he has schizophrenia or needs medications.  When Dr. Frazier asked if he would take his antipsychotic medication if he were released to the community, appellant said "he would not."  It was important that appellant take his medication, Haloperidol, because the recommendation is that patients with schizophrenia be on an antipsychotic medication for the rest of their lives.  When a patient discontinues antipsychotic medication, "there is a significant chance that the patient will what we call decompensate, which means they will experience symptoms of delusions, of hallucinations, of disorganized thought processes.  Basically their illness, the symptoms of their illness will increase."  Given appellant's statements that he is not mentally ill and does not need medication, Dr. Frazier believed that if he "is released to the community unsupervised and he does not take his medication, over time his

7

symptoms will increase and he is likely to become delusional again and is likely to have an episode of violence related to those delusions."

Finally, appellant did not have a forensic relapse prevention plan, which is "a manual for [patients] in the community," so that if they start to experience more symptoms or do not know what to do, "they can look back at this." The goal is for patients to build their own specific plan as they attend their psychosocial treatment groups. The fact that appellant did not have a relapse prevention plan contributed to Dr. Frazier's belief about appellant's dangerousness because, "[w]ithout this plan, I am concerned that he will not be able to manage his major mental illness in the community. I am again also very concerned that he's expressed he is not interested in medication or mental health treatment when he returns to the community."

On cross-examination, Dr. Frazier acknowledged that the only evidence of violence by appellant was the underlying offense and an episode that occurred while he was in prison, before he was adjudged an MDO.[3] There had been no indication of violence or aggression in all of the years appellant had been hospitalized or in the community on CONREP following his prison term. While in the hospital, he was commonly described by hospital staff as "liked and cooperative." For example, a rehabilitation therapist had written in appellant's treatment plan conference notes in September 2019, that he was "a quiet gentleman in the rare occasions in which he would approach this writer [the therapist,] he greets the person with a smile and say[s] a nice thing." In a progress note from November 2019, shortly before trial, a nurse

---

[3] In response to subsequent questioning from the trial court, Dr. Frazier reviewed his notes and testified that over 20 years earlier, while in prison in 1998, appellant had become violent and gotten into a fight with several officers, breaking one officer's finger. The officers noted that "he was behaving very strangely" at the time of the battery.

had "reported that he is pleasant toward staff and peers and spends most of his time in his room."

Dr. Frazier had reviewed records regarding appellant's 11 years in CONREP, and believed that since his return to the hospital in 2014, appellant had "plateaued" in terms of his level of insight and participation in treatment, although if he increased his group attendance "some of his insight may be a little bit better." Dr. Frazier also acknowledged, however, that appellant had been diagnosed with borderline intellectual functioning, which was now called "unspecified intellectual disability." This disability did have some effect on his ability to understand what was going on, but Dr. Frazier believed that repetition is key and leads to a better understanding. Dr. Frazier further acknowledged that appellant was taking his antipsychotic medication voluntarily "because he is expected to."

When asked about appellant sometimes seeming confused, Dr. Frazier acknowledged that a nurse had written in a December 2018 note in appellant's hospital record that appellant said that "he was trying to go to his groups, but he doesn't understand a lot about what they are talking about" and that he had not started his relapse prevention plan because it was too complicated. The nurse also wrote that appellant knew what his diagnosis was but did not know what it meant.

Dr. Frazier agreed that not everyone who is diagnosed with schizophrenia would be dangerous in an unsupervised setting, and that someone with schizophrenia who has no insight into his or her mental illness and no internal motivation to treat it is "[n]ot necessarily" dangerous in an unsupervised setting. It would depend on the specifics of the case. He nevertheless believed that appellant's lack of insight and schizophrenia

9

would make him dangerous based on "the fact that in response to the delusions in 1990, he responded violently."

Finally, after appellant's trial counsel noted that appellant was 39 when he committed the underlying offense and was 69 at the time of trial, he asked Dr. Frazier, "assuming that [appellant] was not in a supervised setting, that he would decompensate and that his symptoms would increase," was "there any evidence in the last 30 years that would lead you to believe that that decompensation would result in violence?" Dr. Frazier responded, "No."

On redirect examination, however, Dr. Frazier testified that he still believed that appellant currently represented a substantial danger of physical harm to others as a result of his mental disorder because appellant had said that if he were to be unsupervised in the community, he would not take his medication. The longer appellant "is without his medications, the more delusional he will become, and he is likely to act out in a violent manner in response to those delusions."

In response to questioning by the trial court, Dr. Frazier testified that his first two meetings with appellant lasted about 10 minutes and the third and final meeting lasted about 20 minutes. When asked about any side effects from the antipsychotic medication, Dr. Frazier testified that appellant had a tremor that had been treated with Cogentin, but he was tapered off of that medication because it can interfere with an older person's cognitive abilities. When asked what would get appellant "to full remission," Dr. Frazier explained that would involve having "no delusions about his instant offense and his thought process would be linear, logical, and goal directed." Finally, in response to the court's question, "what treatment plan will he need at age 70 to transition into the community given his cognitive

10

challenges and his mental health status?" Dr. Frazier testified that "the main thing[s] that we are looking for" are "an acknowledgement of his mental illness and an acknowledgement that he needs to be in mental health treatment," "acknowledging that he does need psychiatric medications," being "able to recognize the warning signs for when his mental illness is becoming more severe," and having "an action plan." Appellant could work on all of these issues while in the hospital.

Following arguments of counsel, the court ordered appellant's commitment extended for one year, explaining: "This case is a difficult one for the court in light of the fact that the physicians cannot point to any most recent outburst or anything that would give rise to the court having confirmed information of overt acts that show that [appellant] is a danger to others. [¶] . . . [¶]

"It is clear to the court beyond a reasonable doubt that [appellant] does suffer from a severe mental disorder, namely, schizophrenia, and that his mental disorder based upon this evidence received from the experts, is not in remission and cannot be kept in remission without continued treatment, but that he is in partial remission.

"I made sure that I observed [appellant] throughout these proceedings. I noticed that he does have tremors that get more severe the longer he sits or when he's seemingly anxious or agitated.

"Because of his severe mental disorder, the experts indicate that he presently represents a substantial danger of physical harm to others because he doesn't have appreciation for his mental disorder and that it substantially impairs his thoughts, his perceptions of reality, his emotional process, and his judgment, all of which become[] grossly impaired.

11

"And that was shown by his behavior when he was hospitalized and his refusal to adhere to medical treatment or to follow any directives and then going AWOL.

"And in the absence of treatment, this will only become exacerbated. And that was also revealed when he was not in compliance with his medication and they found him in a soup kitchen, and the demonstrative personalities [*sic*] that he showed at that time.

"I'm not including the disorder in terms of his developmental disabilities because I don't believe it's appropriate for me to consider that as a factor, but it does give me caution in terms of my interpretation of the evidence when the physicians say [appellant] stays in his room, he is not participating in group, and that he doesn't have a full appreciation. And that's why I wanted to know whether his age was also a factor in that and whether he's decompressing [*sic*] on a couple of levels.

"But it appears that a severe mental disorder may not be kept in remission without treatment given the medication regimen that he has, the need to acknowledge his medical condition, and his need to agree to be medically compliant with medication and therapy.

"And he does not have a relapse plan nor has he been willing to participate or even meet with CONREP.

"The psychiatrist, I was really concerned to learn over time he has spent 40 minutes with [appellant]. I was somewhat dismayed, because I believe psychologists and psychiatrists may have a little more influence at the early stages than maybe a CONREP representative. But it does appear that the evidence shows that a high possibility of decompression [*sic*] will occur which could result in a serious threat of substantial physical harm to others, harm to himself, and because of misperceptions and decompensation,

12

he can be a substantial danger, and that he does not voluntarily follow his treatment plan."

The court then concluded, based on the evidence presented at trial, that appellant satisfied the criteria for recommitment as an MDO, and therefore ordered his commitment extended until December 3, 2020.

## DISCUSSION

" 'Enacted in 1985, the MDO Act requires that an offender who has been convicted of a specified felony related to a severe mental disorder and who continues to pose a danger to society receive appropriate treatment until the disorder can be kept in remission.' [Citation.] The MDO Act provides for treatment at three stages of commitment: as a condition of parole (§ 2962), in conjunction with the extension of parole (§ 2966, subd. (c)), and following release from parole (§§ 2970, 2972). [Citation.] [¶] . . . [¶]

"Sections 2970 and 2972 govern the third and final phase of MDO commitment, which begins once the offender's parole term has expired. Section 2970 permits a district attorney, on the recommendation of medical professionals, to petition to recommit an offender as an MDO for an additional one-year term. An offender will be recommitted if 'the court or jury finds [1] that the patient has a severe mental disorder, [2] that the patient's severe mental disorder is not in remission or cannot be kept in remission without treatment, and [3] that by reason of his or her severe mental disorder, the patient represents a substantial danger of physical harm to others.' (§ 2972, subd. (c).)" (*People v. Foster* (2019) 7 Cal.5th 1202, 1207–1208.) Similarly, prior to the termination of a postparole recommitment under subdivision (c), a petition for recommitment may again "be filed to determine whether the patient's severe mental health disorder is not in remission or cannot be kept in remission without treatment, and

13

whether by reason of the patient's severe mental health disorder, the patient represents a substantial danger of physical harm to others." (§ 2972, subd. (e).)

While " ' "substantial danger of physical harm" does not require proof of a recent overt act' " for purposes of commitment as an MDO (*In re Qawi* (2004) 32 Cal.4th 1, 24, quoting § 2962, subd. (g)), that does not negate the statutory requirement of proof beyond a reasonable doubt that the person currently poses a substantial danger of physical harm to others, before commitment or recommitment as an MDO is permitted. (See § 2972, subds. (a)(2), (c), (e).)

In the present case, appellant challenges the recommitment order made pursuant to subdivision (e) of section 2972. He first contends "[t]his case demonstrates the misapplication of the MDO criteria based on the trial court conflating three distinct criteria, thereby failing to separately and correctly apply legal standards in a way that distinctly considers current dangerousness." According to appellant, this requires us to perform a "rigorous review beyond that accorded by the substantial evidence standard." We need not address this preliminary contention, however, because we conclude that, even under the substantial evidence standard, the evidence presented at appellant's recommitment trial does not support the court's dangerousness finding and, therefore, its order extending appellant's MDO commitment for another year must be reversed.

"In considering the sufficiency of the evidence to support MDO findings, an appellate court must determine whether, on the whole record, a rational trier of fact could have found that [a] defendant is an MDO beyond a reasonable doubt, considering all the evidence in the light which is most favorable to the People, and drawing all inferences the trier could reasonably

14

have made to support the finding." (*People v. Clark* (2000) 82 Cal.App.4th 1072, 1082 (*Clark*).)

With respect to the findings the trier of fact must make before the criteria for recommitment as an MDO are satisfied, appellant does not challenge the court's determinations in this case that appellant suffers from a severe mental health disorder, schizophrenia, and that his schizophrenia is in partial remission and cannot be kept in remission without treatment. (See § 2972, subds. (c), (e).) Appellant does, however, challenge the court's finding "that by reason of [his] severe mental health disorder, [appellant] represents a substantial danger of physical harm to others." (§ 2972, subd. (c); see also § 2972, subd. (e).) The only rationale the court offered in support of this finding was that "it does appear that the evidence shows that a high probability of decompression [*sic*] will occur which could result in a serious threat of substantial physical harm to others, harm to himself, and because of misperceptions and decompensation, he can be a substantial danger, and that he does not voluntarily follow his treatment plan."[4]

At trial, Dr. Schielke addressed appellant's diagnosis and his failure to fully understand his illness or participate in treatment, but did not opine on his dangerousness. Chang from CONREP, who did not testify as a mental health expert, was concerned that appellant could be dangerous in the

---

[4] As appellant points out in his opening brief, the court's statement, added on to its finding of dangerousness, "that [appellant] does not voluntarily follow his treatment plan" appears to be taken from CALCRIM No. 3457, which is one of several factors for determining if a severe mental disorder cannot be kept in remission, and is not directly related to the question of dangerousness. We will presume the court's added language was an attempt to explain that its finding of dangerousness was based on the concern that appellant would not continue with treatment if he were released, which it believed would cause him to decompensate and become dangerous.

community based on his underlying offense and the risk of decompensation if he discontinued his treatment.

Dr. Frazier, who had met with appellant three times for a total of 40 minutes, was the sole expert to opine on appellant's dangerousness under the MDO Act. He testified that appellant posed a substantial danger of physical harm to others based on evidence that appellant did not participate fully in his treatment and did not have a relapse prevention plan; that he did not have insight into his illness and the need for medication; that he was unlikely to take his medication if released; and that without medication, he was likely to decompensate and have more severe symptoms. According to Dr. Frazier, when appellant "becomes very delusional, he will act out and in sometimes violent manners—in a violent manner," as occurred in appellant's 30-year-old underlying offense, when he repeatedly hit a woman on the head with a board while suffering from delusions, and the battery that took place in prison before he became an MDO.

On cross-examination, however, Dr. Frazier acknowledged that a person with schizophrenia who has no insight into his or her mental illness and no internal motivation to treat it is "[n]ot necessarily" dangerous in an unsupervised setting. He further acknowledged that appellant had not engaged in any violence or aggression since he had been hospitalized 20 years earlier but, instead, was commonly described as "liked and cooperative." Indeed, Dr. Frazier responded in the negative to counsel's question whether, assuming that if appellant "was not in a supervised setting, that he would decompensate and that his symptoms would increase," was "there any evidence in the last 30 years that would lead you to believe that that decompensation would result in violence?"

16

Although subsequently, on redirect examination, Dr. Frazier testified that the longer appellant "is without his medications, the more delusional he will become, and he is likely to act out in a violent manner in response to those delusions," there was actually evidence in the record on this point, showing that appellant *had* gone off of his medications for a substantial period of time while he was in the community, with absolutely no dangerous or violent results.

First, during appellant's approximately 11 years in the community under CONREP supervision, between 2003 and 2014, there was no evidence of a single violent—or even aggressive—incident. Instead, the evidence reflected "an unremarkable record," with appellant essentially complying with CONREP's terms and conditions, except for the two AWOL incidents. In 2008, when appellant first went AWOL from CONREP and stopped taking his medications for up to a month, there were no violent incidents. Then, even after he again went AWOL and stopped taking his medication in 2014, for approximately two months, there were no incidents of violence or aggression. When he was eventually located at a soup kitchen, there was a noted increase in his symptoms of paranoia and delusions, but CONREP staff nonetheless found him "amicable." Appellant simply explained that he did not want to return to CONREP, and instead wanted to sleep in the park. In fact, when the police arrived to arrest appellant and return him to confinement, he did not resist arrest or act out in any way. On the contrary, he was friendly, nodding in recognition from the back of the police car to a CONREP employee he knew.

Finally, Dr. Frazier testified that appellant's level of insight and participation in treatment had "plateaued" since his return to the hospital in 2014. With increased group attendance, "some of his insight may be a little

17

bit better." Dr. Frazier acknowledged, however, that appellant had a diagnosed intellectual disability, which had some effect on his ability to understand what was going on in terms of his diagnosis and treatment. The doctor nevertheless believed that "repetition" could still "lead[] to a better understanding."

All of this evidence demonstrates that appellant has schizophrenia that is only in partial remission; that he engaged in two violent acts before he was committed as an MDO; that without treatment, including his antipsychotic medication, he would likely decompensate; and that he might stop taking his medication if released. Missing from the trial court record, however, is *any* evidence that this would lead him to endanger others. Indeed, the evidence shows that when he did stop taking his medication for two months, although his symptoms of schizophrenia increased, he did not engage in any violent behavior whatsoever.

Respondent's effort to compare appellant to the defendant in *People v. Williams* (2015) 242 Cal.App.4th 861 (*Williams*) is unpersuasive. In *Williams*, the defendant had been found not guilty by reason of insanity (NGI) after he fired a machine gun and injured a police officer and the next day shot at an officer and a police dog, while out on bail following an arrest for methamphetamine possession. His criminal history included molestation of his 10-year-old stepdaughter, three convictions for driving under the influence of alcohol or drugs, and carrying a concealed weapon. (*Id.* at p. 863.) During his NGI commitment, the defendant was consistently diagnosed with alcohol and amphetamine dependence and personality disorder, not otherwise specified. (*Id.* at p. 864.) His treating psychologist believed that if the "defendant relapsed with drugs or alcohol, 'he may very well feel that look, I am going go to [*sic*] down and the system has ruined my

18

life, I am going to take someone down as well.'  Given his impaired judgment, his grudge against authority, his age, and his terminal illness, he might act irrationally and become physically violent." (*Id.* at p. 868.)

There is evidence in the present case showing that, like the defendant in *Williams*, appellant "did not think he needed treatment and did not want to [or in this case was perhaps unable to] change." (*Williams*, *supra*, 242 Cal.App.4th at p. 874.)  Here, however, the *sole* evidence the court relied on to support the dangerousness finding was appellant's violence from decades earlier, with only friendly and nonconfrontational behavior ever since, even while he was AWOL from CONREP, off of his medications for a significant period of time, and decompensating.[5]

Such a complete absence of violent or aggressive behavior of any kind over a long period of time is necessarily an important, objective factor that must not be ignored when determining an MDO defendant's dangerousness.

The trial court, which described this case as "a difficult one" based on the lack of evidence of recent violence or aggression, nonetheless concluded there was a "high possibility" that, if released, appellant could decompensate, which it believed "could result in a serious threat of substantial physical harm to others, *harm to himself . . . .*" (Italics added.)  The court was understandably concerned about appellant's ability to function and keep *himself* safe if he were to stop taking his medication and decompensate after

---

[5] Moreover, although respondent is correct that an appellate court may not reweigh the credibility of witnesses (see *Clark*, *supra*, 82 Cal.App.4th at p. 1083), in the present case, we are not reevaluating the credibility of witnesses.  Rather, we have simply reviewed the totality of the evidence and found it lacking.  (Cf. *In re Anthony C.* (2006) 138 Cal.App.4th 1493, 1504 ["expert medical opinion evidence that is based upon a ' "guess, surmise or conjecture, rather than relevant, probative facts, cannot constitute substantial evidence" ' "].)

being released from the hospital. However, appellant's risk of danger to *others*, not his own welfare, is what was at issue at his MDO recommitment trial. (See § 2972, subds. (c), (e); *People v. Allen* (2007) 42 Cal.4th 91, 98 [While United States Supreme Court has pronounced that "states must ensure due process protections and safeguard liberty interests when a person is civilly committed," it has nonetheless " ' "consistently upheld . . . involuntary commitment statutes *provided the confinement takes place pursuant to proper* procedures and *evidentiary standards*" ' "], italics added.)[6]

We believe appellant's trial counsel summed the situation up well in his closing argument, after discussing all of the evidence presented at trial:

"So, it doesn't give us the evidence that when he goes off medication, that he decompensates and he is likely to act in a violent way. Of course, it's a possibility, but the jury instruction doesn't ask us whether it's a possibility. [¶] So, I think that it's—I'm going to be honest with the court—it's a hard position to argue, because I can see how his health and his best interest might be served by being confined in the hospital, but his liberty interests is [*sic*] he doesn't want to be in the hospital. So, I think we have to hold the district attorney to their standard of proof.

"And in this situation, with the cognitive abilities we have heard about on behalf of [appellant], on his advancing age, on the fact that he appears to

---

[6] There are laws intended to protect individuals who are unable to live safely on their own in the community. For example, the Lanterman-Petris-Short (LPS) Act (Welf. & Inst. Code, § 5000 et seq.) provides for the establishment of a conservatorship for an individual who, "as a result of a mental health disorder, is unable to provide for his or her basic personal needs for food, clothing, or shelter." (Welf. & Inst. Code, § 5008, subd. (h)(1)(A); cf. *People v. Allen*, *supra*, 42 Cal.4th at p. 105 [although defendant no longer fell under jurisdiction of MDO Act, he "might still be involuntarily committed and treated under the LPS Act"].)

have over the past five years at the hospital essentially plateaued in terms of his level of understanding and insight into his mental illness, I don't see any predicted hope on the horizon that [appellant] will see the light and be able to give us the insight and the comprehension that the district attorney and the doctors are looking for before he goes on this other path.

"And essentially we are—you know, he is not dangerous, and we are going to be back here every year until he is not able to move, in which case there will be no—there will be no argument that he's dangerous. But at that point where could he go?

"At this point, he's still able to care for himself, and I think it's time to contemplate his liberty interests and to hold the district attorney to their standard of proof, and they haven't proven the case beyond a reasonable doubt that he poses a substantial danger of physical harm."

In sum, considering the totality of the evidence presented at appellant's commitment extension trial, we conclude a rational trier of fact could not have found beyond a reasonable doubt that appellant "represents a substantial danger of physical harm to others." (§ 2972, subd. (e); see *Clark*, *supra*, 82 Cal.App.4th at p. 1082.)[7] The order extending his commitment for an additional year must therefore be reversed. (*Clark*, at p. 1082.)[8]

---

[7] In his opening brief, appellant cited research that "confirms the error in associating dangerousness with mental illness." Respondent maintains that we should not consider this evidence because it was not presented to the trial court in the first instance. Given the dearth of evidence in the record supporting appellant's current dangerousness, we need not address the propriety of considering the additional authorities cited in appellant's briefing on appeal.

[8] In light of our holding, if any MDO commitment proceedings are held in the future with respect to appellant, the district attorney will be required to present some new evidence of *current* dangerousness before a finding can be made that appellant satisfies the criteria for commitment as an MDO. (Cf.

**DISPOSITION**

The trial court's order extending appellant's MDO commitment for one year, until December 3, 2020, is reversed.

---

*Turner v. Superior Court* (2003) 105 Cal.App.4th 1046, 1060 [appellate court held that "where an individual has been found not to be [a sexually violent predator] and a petition is properly filed after that finding, the professional cannot rely solely on historical information," but must also "explain what has occurred in the interim to justify the conclusion the individual currently qualifies as [a sexually violent predator]"].)

_____
Kline, P.J.

We concur:


_____
Stewart, J.


_____
Miller, J.


*People v. Johnson* (A159208)

Trial Court:                    Alameda County Superior Court

Trial Judge:                    Hon. Trina Thompson


Attorney for Appellant:         By Appointment Under the First District
                                Court of Appeal Appellate Project
                                Rodney Richard Jones

Attorneys for Respondent:       Attorney General of California
                                Xavier Becerra

                                Lance E. Winters
                                Chief Assistant Attorney General

                                Jeffrey M. Laurence
                                Senior Assistant Attorney General

                                Lief M. Dautch
                                Deputy Attorney General

                                Elizabeth W. Hereford
                                Deputy Attorney General