Filed 1/17/24  P. v. Carranza CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D082083 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. Nos. EMH000313, EMH000480, EMH000633) |
| VICTOR CARRANZA, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Imperial County, Jeffrey B. Jones, Judge.  Reversed with directions.

Steven S. Lubliner, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Collette C. Cavalier and Nora S. Weyl, Deputy Attorneys General, for Plaintiff and Respondent.

Victor Carranza appeals an order extending his civil commitment to the state hospital system as a person found not guilty by reason of insanity (NGI)

on a charge of attempted murder. (Pen. Code,[1] §§ 187; 664.) Carranza contends substantial evidence does not support the trial court's findings that he (1) met the felony predicate requirement and (2) represented a substantial danger of physical harm to others because of his severe mental disorder. Carranza also argues that he established a medication compliance affirmative defense.

We requested and received supplemental briefing on issues relating to the trial court's jurisdiction. Although we now decline to reverse the order on jurisdictional grounds, we conclude there is insufficient evidence to support a finding, beyond a reasonable doubt, that Carranza currently poses a substantial danger of physical harm to others under section 1026.5, subdivision (b)(1). Accordingly, we reverse the court's recommitment order on that ground alone.

FACTUAL AND PROCEDURAL BACKGROUND

*A. Carranza's Commitment*

In 2003, Carranza heard voices telling him that the Mexican Mafia was planning to torture his uncle, so Carranza attacked his uncle with a metal bar believing that he was saving him from torture.[2] Carranza was using methamphetamine at the time of the offense and was subsequently diagnosed with schizophrenia. The People's recommitment petitions state that he was

---

[1] Undesignated statutory references are to the Penal Code.

[2] No exhibits or documents were admitted into evidence at the hearing to extend Carranza's commitment, even though the parties' expert witnesses both testified about information from state hospital records. However, since neither party objected to the experts' reliance on those records, and neither party now contends that their testimony is inadmissible on hearsay grounds, we include facts from the experts' testimony here.

charged with attempted murder (§§ 664, 187) and assault with a deadly weapon (§ 245, subd. (a)(1)).[3] Carranza pled not guilty, and after a hearing, the trial court found Carranza NGI of attempted murder. The court ordered him committed to a state hospital for treatment under section 1026 *et seq.*, which governs the commitment and release of individuals found NGI.

Carranza has remained under civil commitment since 2004. During this time, the state has twice discharged him to an outpatient conditional release program (CONREP). During his first CONREP discharge in 2008, Carranza spent three years in the program before being re-hospitalized because he had delusions that he contracted a contagious disease and was going to be attacked. The hospital referred Carranza to CONREP again in 2016, but the state revoked his participation in 2018 after he tested positive for methamphetamine and marijuana and behaved erratically.

*B. Recommitment Petitions*

On November 20, 2019, the People filed a petition to extend Carranza's commitment for another two years under section 1026.5, subdivision (b), from March 8, 2020, to March 8, 2022. At a hearing in January 2020, the People and the trial court confirmed that Carranza's release date pursuant to section 1026.5 was March 8, 2020. The court proposed setting a trial date for the petition in February 2020 to comply with the time limits in section 1026.5, subdivision (b)(4).[4] The parties agreed to waive time so that Carranza's

---

[3]    Although Carranza contends the prosecution failed to prove he was charged with a felony for purposes of section 1026.5, subdivision (a) requirements, we need not decide that issue and note his alleged commitment offenses only to provide relevant context.

[4]    Section 1026.5, subdivision (b)(4), provides in relevant part: "The court shall conduct a hearing on the petition for extended commitment. . . . The trial shall commence no later than 30 calendar days prior to the time the

3

counsel could have him evaluated for CONREP eligibility. The court characterized the time waiver as a "self-commitment" and set the matter for a trial setting conference in February 2020.

Due to COVID-19 restrictions, Carranza's CONREP application, and defense counsel's requests for additional time after the state hospital denied CONREP discharge, the matter was continued several times. Carranza's counsel continued to waive time. Apart from applying for CONREP, at no point did Carranza request pre-trial release.

In response to the court's inquiry during a July 2020 hearing, the People filed a statement asserting that March 8, 2020, was still Carranza's maximum commitment date, and that his "present commitment stems from the petition to extend commitment that was timely filed by the prosecution on November 20, 2019[.]" The People also noted that the time requirement for trial under section 1026.5, subdivision (b)(4), had "been waived on several occasions and thus the matter remains on a setting stage[.]"

At a subsequent hearing in August 2020, confusion arose as to "procedural issues" regarding Carranza's time of commitment, and his counsel waived time and requested another continuance. At another hearing that month, Carranza stated he "wishe[d] to extend his commitment," so his counsel requested another continuance to discuss that with his client. The record again notes that Carranza waived time and the court found "good cause to continue the matter." Numerous continuances followed—at defense counsel's request—to allow additional time to address communication and procedural issues, time calculation, research, and obtain an expert witness. Minute orders show that the court expressly noted good cause or time

person would otherwise have been released, unless that time is waived by the person or unless good cause is shown."

4

waivers in connection with most of the continuances. Even after the court initially set the case for trial in August 2021, that date was also continued numerous times at defense counsel's request, including to discuss a potential agreement to resolve the case before trial.

Meanwhile in September 2021, the People filed a second petition to extend Carranza's commitment, stating that per the unadjudicated original petition, Carranza would be released on March 8, 2022. The second petition requested that Carranza's commitment be extended for another two years from May 10, 2022, to March 8, 2024.[5] A new case number was assigned to the second petition, and the court heard the original and second petitions together.

The People filed the third and most recent petition for recommitment on March 9, 2023, which sought to extend Carranza's commitment from March 8, 2023, to March 7, 2025. The People explained they did so out of an "abundance of caution," and the court noted this "might be a conservative way to go about it[.]" At that point, the parties and the court were operating under the assumption that the relevant maximum release date was March 8, 2023—rather than March 8, 2022, the end date for the second petition—for reasons that remain unclear, even after we received the parties' supplemental briefing.

After the parties were unable to resolve the matter, the court consolidated the three petitions and the case proceeded to a bench trial in May 2023.

---

[5] The People note in their supplemental letter brief that "[i]t is unclear from the record why the [second] petition has a May 10, 2022 date for the requested extension if the previous petition's extension was set to expire on March 8, 2022."

*C. Trial Testimony*

The People called Dr. Jason Rowden and Carranza called Dr. Alan Abrams to testify as medical experts. The experts agreed that Carranza suffers from schizophrenia, a severe mental disorder. They disagreed, however, about whether Carranza would pose a substantial danger of physical harm to others if released. Carranza also testified.

1. Dr. Rowden

Dr. Rowden, a clinical and forensic psychologist, interviewed Carranza three times in 2021 and 2022 and reviewed Carranza's previous evaluation reports. Dr. Rowden noted that in 2021, Carranza reported having auditory hallucinations involving the Mexican Mafia attempting to control him or "sexually assaulting him[.]" But during a December 2022 interview, Carranza said he was no longer hearing voices or experiencing paranoia. Dr. Rowden noted that Carranza had been taking Risperidone for "quite some time" but was not open to increasing his dosage or trying different medicines "to more fully treat what he struggles with at times." When Dr. Rowden asked Carranza about his medication, Carranza said it was "working fine" and he did not think he needed any changes. Dr. Rowden said Carranza was not fully compliant with his medication because even though he took his prescribed dose and the hospital had not sought an involuntary medication order, Carranza was unwilling to be "open-minded or flexible about trying different things or increasing meds to adequately treat" ongoing symptoms.

Dr. Rowden opined that Carranza had "limited insight" into his mental condition because, although he had a "basic awareness of some of the symptoms," he was "not fully aware" of, or not "fully forthright" about all of them. Carranza was "somewhat guarded or paranoid" about discussing his symptoms, and according to Dr. Rowden, his unwillingness to openly talk

6

about his symptoms suggested an "[in]adequate understanding of his risk for future dangerous behavior."

Dr. Rowden noted that Carranza's lack of insight could also lead to a relapse into substance abuse, which "often result[s]" in criminal and violent behavior. But Dr. Rowden acknowledged Carranza had not engaged in violence or threats of violence, had never been administered emergency medication, had consistently attended group therapy, and showed "some sign of some improvement," with no indication of drug use since 2018. Dr. Rowden attributed Carranza's success to "being in a highly structured and secure setting" at the hospital where access to drugs and alcohol is limited, and staff monitors medication compliance.

When asked about Carranza's previous CONREP discharges, Dr. Rowden said that for Carranza to qualify for CONREP, Carranza's treatment team would have had to believe he had "adequate insight" into his mental illness, took responsibility for past actions, and had "a basic understanding" of how his mental illness was involved in the committing offense. Carranza would have had to show, among other things, that he was "consistently participating in . . . and complying with treatment," including medication or group therapy. Dr. Rowden found it concerning, however, that Carranza "still ha[d] difficulty acknowledging the reasons for why he was revoked from CONREP in the past," which demonstrated that Carranza lacked insight and was "likely to repeat the same mistakes that led to those problems[.]"

Dr. Rowden concluded Carranza would be a danger to the community if released because of his "difficulty fully acknowledging his symptoms," inconsistent success with CONREP, and guardedness about discussing symptoms and medication changes. Dr. Rowden further opined that the

stress of adapting to release could trigger more mental health symptoms or a drug relapse, which could lead to violent behavior. In his view, Carranza was not likely to comply with outpatient treatment because he did not "have an adequate plan for how to manage his mental health condition." But Dr. Rowden acknowledged that Carranza said he wanted to continue taking his medication, attend Alcoholics Anonymous (AA) meetings, have an AA sponsor, and continue seeing his doctor. He noted that Carranza appeared to recognize that he would have to take medication for the rest of his life, unless his doctor instructed otherwise. Dr. Rowden also agreed that Carranza had "a rudimentary understanding" of potential triggers for his mental illness and drug use and said he would seek help from his doctor or his family if he was having issues.

2. Dr. Abrams

Dr. Abrams, a psychiatrist specializing in addiction and forensic psychiatry, interviewed Carranza once in 2022 and reviewed Carranza's prior evaluation reports. He concluded that Carranza would not pose a substantial danger of physical harm to others because his underlying offense was "highly related" to his substance abuse, and Carranza had a violence-free history since then. Dr. Abrams noted that Carranza was committed to a sober lifestyle, he had worked with a sponsor in CONREP, and there was "no evidence" that Carranza "is likely to relapse."

Dr. Abrams also based his opinion on his view that Carranza was unlikely to stop his medications "whether under supervision or not." He noted that Carranza had "never been written up for refusing medications or not going along with his treatment plan," and that Carranza appeared sincere about not using drugs in the future. Dr. Abrams believed that "without substance abuse and without going unmedicated, people with severe

8

mental illness pose no greater risk of danger than the baseline population rate."

Dr. Abrams further testified that Carranza had sufficient insight to understand that he "suffers from a mental illness[,]" that "he can never use illicit intoxicants again," and that "he needs to see a doctor for the rest of his life and take the prescribed treatment." Carranza was also able to understand that he attacked his uncle because he was abusing drugs and his "imagination went crazy." Carranza seemed willing and able to commit to a lifetime of AA meetings, having a sponsor, seeing a psychiatrist, and seeing a social worker or counselor. His thoughts were also "logical, linear, and coherent" without disorganization or tangentiality. Dr. Abrams observed no overt symptoms and noted that there was no indication Carranza's treatment team ever increased his medication dosage.

Dr. Abrams acknowledged, however, that it was "a possibility" Carranza could relapse, and he went on to say that as an addiction psychiatrist, "my line is everyone relapses at some point" and that "25 years of sobriety is not a guarantee against relapse." When asked again whether it was possible that Carranza might one day relapse, Dr. Abrams said it was "a possibility" that could not be predicted with certainty, and that "anybody can start using drugs and become dangerous." Nevertheless, in light of Carranza's commitment to seeking treatment and support, Dr. Abrams believed that Carranza could be released into the community without posing a substantial risk of danger.

### 3. Carranza

Carranza testified briefly on his own behalf and said that he had been attending AA meetings for the past 20 years, he previously had an AA sponsor, and he intended to get another sponsor upon release. He expressed

9

a desire to seek post-release mental health treatment to get his medications, and he also intended to continue his education because he "was a straight A student in college" and "got a certificate in air conditioning" during his first CONREP discharge. Carranza said he would take medication as recommended by his psychiatrist, and that he had been taking medication without refusal for the past 20 years. He believed that he was "doing just fine" on his current dosage according to what "the doctors told [him]," and that there was no reason to increase it.

### D. Court's Findings

After hearing testimony, the trial court first found that Carranza was still suffering from schizophrenia, a severe mental disorder. The court further found that Carranza posed a substantial danger of physical harm to others. Crediting Dr. Abrams's testimony that Carranza's substance abuse played "an enormous role" in the underlying offense, the court went on to conclude—based on Dr. Abrams's "line" that "everyone relapses" and Carranza's 2018 positive drug screen in CONREP—that Carranza would "at some point relapse to the use of methamphetamine." The court extended Carranza's commitment from March 8, 2023, through March 7, 2025, the period covered by the People's third petition.

The court ordered the People to prepare and submit a final commitment order for signature. However, because no final order was prepared at the time Carranza filed his notice of appeal, his appeal was initially premature. (*Salowitz Org. v. Traditional Indus.* (1990) 219 Cal.App.3d 797, 808 ["Where findings of fact or some other type of formal evidence of the judgment or order is required, an appeal does not lie from a minute order."]; *see also Herrscher v. Herrscher* (1953) 41 Cal.2d 300, 304–306 [minute order that directs the preparation of a formal written order is

10

not itself appealable].) At our request, the People obtained a final signed commitment order dated September 13, 2023, which states that Carranza continues to pose a substantial danger of harm to others. We now construe the premature notice of appeal as being from the final commitment order. (Cal. Rules of Court, rules 8.483(a)(1), 8.308(c).)

DISCUSSION

I

We begin by discussing a procedural question we asked the parties to address in supplemental briefing. Specifically, we first requested briefing on whether the third petition granted by the trial court, which requested Carranza's re-commitment from March 8, 2023, to March 7, 2025, was filed after his maximum commitment date had already expired. Second, if it had in fact expired, we asked whether the trial court had jurisdiction to rule on that petition. (See *People v. Lara* (2010) 48 Cal.4th 216, 235–236 ["As we explained in [*People v. Allen* (2007) 42 Cal.4th 91], if an extension petition is not filed before the current commitment ends, the defendant is no longer subject to constraint under the NGI or [mentally disordered offender (MDO)] statutes."].)

If Carranza's maximum commitment date was March 8, 2023, as the court and the parties apparently believed when the third petition was filed on March 9, 2023, then that petition was filed one day late. The parties both admit in their letter briefs, however, that there is no discernible explanation for why the trial court and the parties believed Carranza's maximum commitment date was March 8, 2023 at the time the People filed the third petition. The first petition covered the period from March 8, 2020 to March 8, 2022, and the second petition (filed in September 2021) covered the period from May 10, 2022 to March 8, 2024. The People stated in their letter brief

11

that they intended to file "consecutive petitions," but admitted that they had no explanation for the May 10, 2022 beginning date for the second petition, nor could they explain the March 8, 2023 beginning date for the third petition. One would expect that the third petition would cover March 8, 2024 through March 8, 2026, the two-year period immediately following expiration of the period covered by the second petition. If it had, because the People filed the third petition in March 2023, it would have fallen well before the end of the period covered by the second petition. Yet neither the court nor the parties explained why the third petition requested a two-year extension from March 8, 2023 through March 7, 2025, and it is further unclear why the trial court only granted the third petition.

Regardless, the parties do not dispute that the People timely filed the original November 2019 petition. The record also shows that the trial court granted continuances from the initial filing up through the May 2023 trial date at defense counsel's request, usually with express reference to time waivers and good cause shown. (See § 1026.5, subd. (b)(4).) Furthermore, given the confusion in the record and the lack of an explanation for treating March 8, 2023 as the relevant date for maximum commitment purposes, we cannot conclude that the third petition was untimely. Though the record is unclear on many things, it does indicate that Carranza and his counsel requested multiple continuances and essentially agreed to extend his civil commitment voluntarily until the petitions could be adjudicated. Accordingly, we cannot conclude that the trial court's granting of the third petition was improper on jurisdictional grounds. Rather, for the reasons that follow, we reverse the trial court's order because we agree with Carranza's contention that there was insufficient evidence to support his recommitment.

12

II

"[W]e review the entire record in the light most favorable to the extension order to determine whether any rational trier of fact could have found the requirements of section 1026.5(b)(1) beyond a reasonable doubt." (*People v. Zapisek* (2007) 147 Cal.App.4th 1151, 1165 (*Zapisek*).)  Under section 1026.5, a person who is found NGI may be committed to a state hospital for a period no longer than the maximum prison sentence for his or her offenses.  (§§ 1026, 1026.5, subd. (a)(1).)  This commitment may be extended in up to two-year increments if, because "of a mental disease, defect, or disorder, [the person] represents a substantial danger of physical harm to others."  (§ 1026.5, subd. (b)(1), (8).)  To establish the substantial danger of physical harm element, the prosecution must prove beyond a reasonable doubt that the person has, " 'at the very least, serious difficulty controlling his [or her] potentially dangerous behavior.' " (*People v. Redus* (2020) 54 Cal.App.5th 998, 1010 (*Redus*), quoting *Zapisek*, at p. 1165; *People v. Williams* (2015) 242 Cal.App.4th 861, 872.)

The parties do not dispute that Carranza has a mental disorder, so we focus on the substantial danger analysis.  The People's sole expert witness, Dr. Rowden, recommended against release and reasoned that Carranza's lack of insight *could* lead to a relapse into substance abuse, which *often* results in criminal and violent behavior.  Dr. Rowden also believed Carranza had an inadequate plan for how to comply with outpatient treatment and "manage his mental health condition."

While a single expert opinion may be sufficient to constitute substantial evidence to support recommitment (*Zapisek, supra*, 147 Cal.App.4th at p. 1165), the opinion cannot be based on a " ' "guess, surmise or conjecture, rather than relevant, probative facts" ' " (*In re Anthony C.*

13

(2006) 138 Cal.App.4th 1493, 1504). Here, there was little evidence beyond conjecture and vague generalities that Carranza's lack of insight would likely lead to a relapse into substance abuse and a substantial danger of violence. As Dr. Abrams observed, and Dr. Rowden did not refute, Carranza had enough insight to understand that he "suffers from a mental illness[,]" that "he can never use illicit intoxicants again," and that "he needs to see a doctor for the rest of his life and take the prescribed treatment." Carranza was also able to understand that he attacked his uncle because he was abusing drugs and his "imagination went crazy." The People presented no evidence as to why this level of insight, even if limited, would make Carranza sufficiently likely to relapse into drug use such that he would pose a substantial danger of physical harm to others.

Furthermore, Dr. Rowden acknowledged that Carranza had a "basic understanding" of how his mental illness was involved in the committing offense, and Carranza indicated he understood that he would have to take medication for the rest of his life, unless instructed otherwise. Dr. Rowden observed that Carranza was "somewhat guarded or paranoid" about discussing his symptoms and resistant to increasing his medication dosage, but he did not explain how this made Carranza's insight into his symptoms so inadequate that he met the standard for recommitment under section 1026.5. In other words, while Dr. Rowden pointed out ways in which Carranza could have *more* insight into his illness and triggers, he did not explain why Carranza's "basic" level of insight supported a conclusion that he posed a substantial danger of physical harm. (Cf., e.g., *People v. Kendrid* (2012) 205 Cal.App.4th 1360, 1370 [substantial evidence to support NGI defendant's commitment where it was undisputed that defendant had " 'absolutely no insight into his behaviors that lead to violence' "].)

14

The trial court also erroneously relied on an isolated comment Dr. Abrams made that his "line" as an addiction psychiatrist "is everyone relapses at some point[,]" even though he said just before that comment, and shortly after, that it was only "a possibility" Carranza *might* relapse. And earlier in his testimony, Dr. Abrams expressly said there was "no evidence that Mr. Carranza is likely to relapse." He went on to say that the possibility of relapse could not be predicted with certainty, and that "anybody can start using drugs and become dangerous." Considering the totality of his testimony, Dr. Abrams's passing comment that "everyone relapses" is not a basis for recommitting Carranza.

As for Carranza's plans for managing his symptoms upon release, Dr. Rowden acknowledged that Carranza had "a rudimentary understanding" of potential triggers for his mental illness symptoms and drug use—including not taking medication—and that Carranza would seek help from his doctor or his family if needed. He noted that Carranza planned to continue participating in AA, was looking to get an AA sponsor, and would continue taking his prescribed medication as he had been doing for decades. Carranza also told Dr. Rowden that he would report voices when he heard them, as he has done in the past. Although Dr. Rowden opined that Carranza did not have an "adequate plan" for managing his symptoms, it is unclear *why* Carranza's plan was not adequate, especially given his proven ability to participate in AA, attend group therapy, and take his medication.

Our Supreme Court has recognized that in civil commitment schemes, a "person's amenability to voluntary treatment is a factor in determining whether commitment is necessary. [Citations.]" (*People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888, 928, citing *People v. Bolden* (1990) 217 Cal.App.3d 1591, 1600 [in NGI recommitment proceeding, defendant may

15

present evidence that medication is effective and he will take medication]; *People v. Williams* (1988) 198 Cal.App.3d 1476, 1482–1483 [in NGI sanity restoration proceeding, trial court erred by instructing that person could not be restored to sanity unless it was shown he needed no medication].) Even if Carranza's understanding was "rudimentary," the People presented no evidence showing why his understanding of potential triggers, and his plans for how to avoid them, were so inadequate that he posed a substantial risk of physical harm to others.

While the People emphasize that Carranza's compliance can be attributed to being in a hospital setting, the fact that Carranza continued to take medication during CONREP discharges, and attend group therapy, at least suggests that he would comply with prescribed treatment in the community. The People's argument would be more persuasive if Carranza had resisted taking prescribed medication in the past or refused to acknowledge his need for treatment. Without considering each individual's particular circumstances, the People's argument—that a structured hospital setting contributes to compliance—could be used against every committed person. Moreover, as one Court of Appeal noted, while a court may be "understandably concerned about [a committed person's] ability to function and keep himself safe if he were to stop taking his medication and decompensate after being released from the hospital[,]" the person's "risk of danger to others, not his own welfare, is what was at issue" at his recommitment trial. (*People v. Johnson* (2020) 55 Cal.App.5th 96, 110, italics omitted (*Johnson*).)

The trial court relied on the fact that Carranza had a positive drug screen while on CONREP the second time, but even then Carranza did not engage in physically violent behavior. This undercuts the implication that

16

substance abuse would lead Carranza to be violent. The court in *Redus*—in finding insufficient evidence to support an NGI recommitment—found it significant that there was no indication in the record of violent or aggressive behavior, "even through CONREP releases and medication lapses." (*Redus, supra*, 54 Cal.App.5th at p. 1012 [reversing commitment extension for insufficient evidence despite the NGI defendant's continuing delusions and lack of insight about his underlying murder offense].) Although Dr. Rowden testified that Carranza was reported to have displayed "erratic" and "aggressive" behavior during his second CONREP discharge, when asked to clarify, he said Carranza was "unwilling to admit to any wrongdoing"—but made no mention of any physical aggression. Indeed, there is no evidence in the record of any violence or any medication lapses by Carranza during his 20-year commitment, despite recurring symptoms during his first discharge, and a drug relapse during his second.

Lastly, the People rely on the fact that Carranza reported delusions in 2021, and on Dr. Rowden's testimony that Carranza continues to have "occasional auditory hallucinations[.]" But Dr. Rowden acknowledged that in December 2022, Carranza said he no longer hears voices, and neither expert concluded that Carranza exhibited any psychosis during their interviews.

Even if Carranza was experiencing active symptoms of mental illness, that fact alone would not be sufficient to support recommitment under the case law. In *People v. Cheatham* (2022) 82 Cal.App.5th 782 (*Cheatham*), the Court of Appeal found insufficient evidence that Cheatham, who was found NGI for escaping custody and resisting an officer, would pose a substantial danger of physical harm to others. (*Id.* at p. 786.) He was diagnosed with schizoaffective disorder and, like Carranza, substance abuse disorder. (*Ibid.*) Evidence showed that while Cheatham's medication did not stop his

17

symptoms altogether in that he still heard voices, his medication made him better able to manage his symptoms. (*Ibid.*) The prosecution's experts in *Cheatham* opined that given his past drug use, he might resort to drugs upon release, which would "likely increase his mental health symptoms," and in turn "decrease his compliance with taking medications." (*Id.* at pp. 787–788.) Like Carranza, Cheatham acknowledged his mental illness and past substance abuse and asserted that he would participate in AA, would not relapse, and would rely on medication to help him cope with his auditory hallucinations. (*Id.* at p. 788.)

In reversing Cheatham's recommitment order, the Court of Appeal concluded that while "*some* individuals with Cheatham's mental disorder could have serious difficulty controlling their dangerous behavior in the event that they discontinued their medication and their hallucinations . . . resumed, there was no evidence that tied such a conclusion to Cheatham. Our focus is not on some hypothetical person who shares Cheatham's mental disorder, but on Cheatham himself." (*Cheatham, supra*, 82 Cal.App.5th at p. 790.) The court noted that even while Cheatham exhibited mental health symptoms while on supervised release, the record included no reference to dangerous behavior. (*Ibid.*) The court stated: "Although we accept that Cheatham *could* relapse into drug and alcohol use if released, which *could* then increase his mental health symptoms, we find this speculative outcome insufficient in itself to support continued commitment due to substantial risk of danger." (*Id.* at p. 793.)

Such is the case here. While Dr. Rowden's testimony may support a finding that someone with Carranza's mental disorders *could* become dangerous, the evidence did not connect that speculative *possibility* to Carranza's particular circumstances and history so as to support a finding

18

beyond a reasonable doubt that *Carranza* posed a substantial risk of physical harm to others. And while Cheatham's underlying offense did not involve violence in the way Carranza's offense did, the numerous similarities in their treatment and behavioral histories, and in the expert opinions presented at trial, support the conclusion that there is also insufficient evidence to support recommitment here. This aligns with the court's conclusion in *Cheatham* that we cannot assume that people with an extended record of non-violent behavior "will struggle to control dangerous behavior simply because they have, or are likely to have, active mental health symptoms—whether triggered by drug use, alcohol use, or something else." (*Cheatham, supra*, 82 Cal.App.5th at pp. 793–794.)

Other cases have reached a similar result even when the defendant's commitment offense was violent. In *Redus*, for example, the commitment offense was a murder involving postmortem intercourse with the victim. The appellant in *Redus* was found NGI, and he still suffered from psychosis and delusional thoughts involving "fixed false beliefs" at the time the People sought his recommitment. (*Redus, supra*, 54 Cal.App.5th at pp. 1001, 1002–1003.) Evidence also showed that Redus did not believe he had a mental disorder, and that he had "homicidal thoughts" while on supervised release. (*Id.* at pp. 1002–1003, 1005, 1007.) Moreover, his release to CONREP had been revoked on three or four occasions. (*Id.* at p. 1002.) The Court of Appeal nonetheless reversed his recommitment for lack of substantial evidence that he would have serious difficulty controlling his potentially dangerous behavior, finding no "hint of violence, threatening behavior, or aggressiveness of any kind on the part of appellant over multiple decades, even through CONREP releases and medication lapses. Rather, the evidence showed that [Redus] has controlled his dangerous behavior for decades, despite his

19

ongoing delusions and paranoia." (*Id.* at p. 1012.) For these reasons, the court concluded that the evidence failed to "provide the required link between appellant's ongoing mental illness and his purported difficulty in controlling his potentially dangerous behavior." (*Id.* at p. 1013.)

The same is true here, and the record contains even more facts in Carranza's favor than Redus had. Unlike Redus, Carranza's auditory hallucinations appeared to be in remission, or were at least reduced, as of December 2022. At no time did Carranza express having homicidal or violent thoughts towards others, as Redus did. Dr. Abrams observed no indications of psychosis, and Carranza at least has sufficient insight to acknowledge that he suffers from a mental disorder. Furthermore, Carranza, unlike Redus, experienced no medication lapses. These facts reinforce our conclusion that "substantial evidence simply does not support the court's finding that [Carranza's] mental illness causes, 'at the very least, serious difficulty controlling his potentially dangerous behaviors.'" (*Redus, supra*, 54 Cal.App.5th at p. 1013.)

This court's recent opinion in *Jenkins* is also analogous, even though that case involved a mentally disordered offender proceeding under section 2970. (*People v. Jenkins* (2023) 95 Cal.App.5th 142, 145 (*Jenkins*).) Jenkins attacked her elderly landlord with a hammer and imprisoned him for several hours in response to paranoid ideation. (*Id.* at pp. 145–146.) After she was convicted of attempted murder and committed to a state hospital, the People petitioned for recommitment and presented evidence that she remained focused on delusions and maintained paranoid beliefs about her landlord. (*Id.* at pp. 146–147.) The People's experts reported that Jenkins had limited insight, wanted to decrease or eliminate her medications, had a history of failing to comply with prescribed medications, and exhibited aggressive

20

behavior. (*Id.* at pp. 147–148.) But Jenkins also expressed a desire to live in a board and care facility upon release, continue with her medications and therapy, and get support from a church group. (*Id.* at pp. 148–149.) Like Carranza, Jenkins's commitment offense was the only evidence in the record that she had ever been violent or dangerous. (*Id.* at p. 151.)

We concluded in *Jenkins* that there was insufficient evidence to support a finding beyond a reasonable doubt that Jenkins represented a substantial danger of physical harm to others. (*Jenkins, supra*, 95 Cal.App.5th at p. 145.) Given that she had not been violent or physically aggressive since her commitment offense, and because her behavior had improved and she had significant medical issues and decreased mobility, this court reversed the trial court's recommitment order. (*Id.* at pp. 145, 153, 155–156.) We noted that even though it is unnecessary to have "proof of a recent overt act" to support recommitment (*Jenkins*, at p. 154, quoting *People v. McKee* (2010) 47 Cal.4th 1172, 1203), the court cannot overlook " 'the statutory requirement of proof beyond a reasonable doubt that the person currently poses a substantial danger of physical harm to others' "[6] (*Jenkins*, at p. 154, quoting *Johnson, supra*, 55 Cal.App.5th at pp. 106–107).

*Johnson* provides further support for our conclusion. In *Johnson*, another case involving a section 2970 commitment proceeding, Johnson was convicted of assault after he struck a stranger repeatedly with a board while suffering from a delusion that she owed him money. (*Johnson, supra*, 55

---

[6]   A concurring opinion in *Jenkins* also expressed concern that the People's experts did not use any of the available standard violence risk assessment tools in formulating their opinions. (See *Jenkins, supra*, 95 Cal.App.5th at pp. 156–160 (conc. opn. of Buchanan, J.).) The same is true of the People's expert in this case, Dr. Rowden, who used only his own clinical judgment in reaching his opinions. "For decades, we have known that this is a notoriously unreliable way of predicting future violence." (*Id.* at p. 156.)

Cal.App.5th at pp. 98–99.)  During his commitment as an MDO with schizophrenia, Johnson participated in CONREP twice, but was returned to the hospital each time for being absent without leave.  (*Ibid.*)  During his second CONREP discharge, Johnson left supervision and was found in a delusional, paranoid, and unmedicated state.  (*Id.* at p. 100.)  Johnson often refused to participate in group therapy and indicated he did not believe that he had a mental illness or needed medication.  (*Id.* at p. 99.)  Although Johnson had exhibited no violence or aggression during his commitment as an MDO, the People's experts opined that he would be dangerous if released because he "did not fully recognize that he had a mental health issue" and could "quickly decompensate" outside of a supervised setting, especially if unmedicated.  (*Id.* at pp. 99–102, 103.)  One expert noted that Johnson still had some delusions—including disbelief that he committed the underlying offense—and that Johnson did not have a "relapse prevention plan" to manage his illness.  (*Id.* at p. 102.)

In reversing the recommitment order, the Court of Appeal in *Johnson* concluded that the record contained no evidence that Johnson's mental illness would lead him to endanger others because "the evidence show[ed] that when he did stop taking his medication for two months" while absent from CONREP, "although his symptoms of schizophrenia increased, he did not engage in any violent behavior whatsoever." (*Johnson, supra*, 55 Cal.App.5th at pp. 109–110.)  The court also observed that "a complete absence of violent or aggressive behavior of any kind over a long period of time is necessarily an important, objective factor that must not be ignored when determining a [mentally disordered offender's] dangerousness."  (*Id.* at p. 110.)

Carranza's case cannot meaningfully be distinguished from this body of case law.  If we were to determine that the expert testimony in this case

22

constituted substantial evidence to support recommitment, then it is difficult to imagine how any mentally ill person who had committed a violent underlying offense, and had a history of substance abuse, could ever meet the standard for release under section 1026.5, subdivision (b). While someone falling into that category *could* hypothetically relapse and have serious difficulty controlling their dangerous behavior, the People here failed to adequately show—without speculating—why and how Carranza himself posed an actual and substantial risk of danger, especially given his track record for complying with prescribed medication and seeking out various forms of treatment and support.

Without any evidence bridging the gap from a purely theoretical risk of danger to a real and substantial risk based on Carranza's particular symptoms, history, or other characteristics, we conclude that a rational trier of fact could not have found beyond a reasonable doubt that he represents a substantial danger of physical harm to others. (See § 1026.5, subd. (b)(1); cf., e.g., *People v. Sudar* (2007) 158 Cal.App.4th 655, 663–664 [NGI defendant suffered from same delusion he had when he committed underlying offense "and consistently maintained that he would do the same thing in the same circumstances"]; *Zapisek, supra,* 147 Cal.App.4th at pp. 1166–1167 [NGI defendant repeatedly acted on delusions and paranoia in inappropriate ways "so as to impose a danger to others," "such as . . . taking steps to escape from the hospital for fear that workmen would return to harm him, or aggressively insisting on money he believed he was owed"]; *People v. Bowers* (2006) 145 Cal.App.4th 870, 879 [NGI defendant "continued to experience auditory hallucinations which commanded her to hurt herself or others," had recently attempted suicide, had poor impulse and anger control, and had a history of assaultive behavior toward others].)

Because we determine that substantial evidence does not support the trial court's order extending Carranza's NGI commitment, we reverse on that ground and do not reach Carranza's remaining arguments.

## DISPOSITION

The trial court's order of September 13, 2023 extending Carranza's NGI commitment is reversed. The trial court is directed to enter a new order denying the People's petition to extend Carranza's commitment.

BUCHANAN, J.

WE CONCUR:

McCONNELL, P. J.

O'ROURKE, J.

24